[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-11273

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 27, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-80023 CR-DTKH

UNITED STATES OF AMERICA,

                                    Plaintiff-Appellee,

versus

ANTHONY H. LINDSEY,

                                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 27, 2007)**

Before EDMONDSON, Chief Judge, BARKETT and COX, Circuit Judges.

EDMONDSON, Chief Judge:

      Anthony H. Lindsey ("Defendant") appeals his conviction and sentence of

300 months' imprisonment for (1) being a felon in possession of a firearm, and (2)

being a felon in possession of one or more rounds of ammunition, both in violation of 18 U.S.C. § 922(g)(1) and the Armed Career Criminal Act, 18 U.S.C. § 924(e). Defendant claims several violations of his Fourth, Fifth, and Sixth Amendment rights for alleged errors at trial and sentencing. Because no reversible error has been shown, we affirm.

## I. BACKGROUND

In February 2004, authorities received a 911 call from a person identifying himself as "Davis" and reporting that four black males were loading guns and putting them in a large white SUV. The SUV was parked behind a Mobil gas station across from a branch of Wachovia Bank. Detective Jason O. Houston ("Houston") and other members of the West Palm Beach Police Department had been investigating a recent series of armed bank robberies in the area. The robberies involved three to four black males who had entered banks with assault-type weapons and who drove large SUV-type vehicles. The police also had knowledge of two robberies committed by two black males using handguns in the parking lot of this very same branch of Wachovia Bank.

2

Believing that another robbery was imminent, several officers -- including Houston and Sergeant Martin Tierney ("Tierney") -- responded to the 911 call. Tierney, the first officer on the scene, observed a white Ford Excursion (a large SUV) parked behind the gas station. As Tierney pulled into and circled the station, he observed the SUV pull out of its parked location. Tierney then radioed the other officers that the vehicle was on the move. But instead of leaving the gas station, the SUV pulled around to a gas pump and stopped. Then, four black men, including Defendant, exited the vehicle. Three of the men walked toward the station's convenience store, and the fourth opened the hood of the vehicle.

Sergeant Tierney then exited his vehicle and drew his shotgun while yelling at the men to get on the ground. Other officers converged on the gas station and secured the scene. Turning his attention to Defendant, who had reached the door of the convenience store, Tierney ordered Defendant to lay down, to which Defendant responded, "What did I do?" After five to eight seconds, Defendant submitted to Tierney's request. Officers then handcuffed each of the four men and placed them in police vehicles. Then, officers observed an armored vehicle pulling up to the bank and guards leaving the bank carrying satchels of money. According to Tierney, employees of the gas station told officers that the SUV had been parked behind the building for two hours.

3

Police then examined the SUV to ensure that no armed persons were inside. After identifying each of the men and checking their backgrounds, the officers learned that all four were convicted felons. Three of the men, however, had no outstanding warrants and were released at the scene. Police also discovered that Defendant was the registered owner of the vehicle. Because Defendant was on parole for armed bank robbery and because the police suspected the vehicle contained weapons, Detective Houston decided to detain Defendant to determine whether he had violated his parole.[1] After Defendant twice refused his consent for officers to search the SUV, Houston looked through the tinted windows of the SUV and saw a pair of binoculars and a black canvass bag that he "believe[d] was a rifle bag."

The SUV, which had expired registration tags, was towed to the police station to inventory its contents. Officers then sought a search warrant before searching the vehicle. Detective Houston and another officer prepared a warrant affidavit based on information they received from other officers and from the 911 operator. After a state judge issued the warrant, officers searched the SUV and discovered a .38-caliber revolver with two rounds of ammunition. The officers

---

[1] Two conditions of Defendant's parole were (1) that he not possess a firearm and (2) that he not associate knowingly with convicted felons.

also retrieved the binoculars and learned that what they thought was a rifle bag was actually an empty portable-chair holder.

Meanwhile, because the police suspected Defendant of being a felon in possession of a firearm, the officers had arrested Defendant and brought him to the police station for questioning. After hearing his Miranda rights and signing a waiver, Defendant admitted that the SUV and the items found inside the SUV belonged to him. During this unrecorded interview, Defendant specifically admitted that he had purchased the gun found in the SUV, that he knew the gun contained two rounds of ammunition, and that he had placed the gun in the center console of the vehicle.

Investigators also conducted an investigation of the items found in the vehicle, including the gun. One crime scene technician attempted to collect latent fingerprints from the gun but was only able to obtain certain "ridge detail" prints. Another fingerprint examiner determined that because the prints had less than six comparison points, they were of no value in making an identification. The examiner, therefore, disposed of the fingerprint card.

At trial, James Jackson ("Jackson"), a jailhouse acquaintance of Defendant, testified that Defendant had made several admissions during their conversations at the Palm Beach County Jail. According to Jackson, Defendant boasted that, on the

day police arrested him, he had been "casing a Wachovia bank from a gas station" with binoculars. Defendant also said he was surprised the police had not found his fingerprints on his gun. In addition, Defendant told Jackson that another friend "was supposed to be in on their deal" but was likely the one who had placed the 911 call.

## II.  DISCUSSION

### A.  Reasonable Suspicion of Criminal Behavior

Defendant argues that the district court erred in denying his suppression motions for evidence discovered in the SUV because the police engaged in an unlawful search and seizure. He specifically maintains that the police lacked reasonable suspicion of illegal activity before stopping and detaining Defendant and failed to make reasonable inquiries to determine whether criminal activity was afoot. For background, see Terry v. Ohio, 88 S. Ct. 1868 (1968). Defendant also argues that, under Florida v. J.L., 120 S. Ct. 1375 (2000), the police failed to verify information from an "anonymous" tip before acting on the information. We review a district court's denial of a motion to suppress evidence as a mixed

question of law and fact, with rulings of law reviewed <u>de</u> <u>novo</u> and findings of fact reviewed for clear error, in the light most favorable to the prevailing party in district court.  <u>United States v. Boyce</u>, 351 F.3d 1102, 1105 (11th Cir. 2003).

To have reasonable suspicion, an officer conducting a stop must "have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity."  <u>United States v. Powell</u>, 222 F.3d 913, 917 (11th Cir. 2000)   "The 'reasonable suspicion' must be more than 'an inchoate and unparticularized suspicion or hunch.'"  <u>Id.</u> (quoting <u>Terry v. Ohio</u>, 88 S.Ct. 1868, 1883 (1968)).  "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."  <u>Illinois v. Wardlow</u>, 120 S.Ct. 673, 675-76 (2000).  Also, "[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity," <u>United States v. Gordon</u>, 231 F.3d 750, 754 (11th Cir. 2000), even if such activity is "seemingly innocuous to the ordinary citizen." <u>United States v. Smith</u>, 201 F.3d 1317, 1323 (11th Cir. 2000).

We examine "the totality of the circumstances" to determine whether the police had "a particularized and objective basis for suspecting legal wrongdoing."

United States v. Arvizu, 122 S. Ct. 744, 750 (2002) (citation and internal quotation marks omitted). We also recognize that the police may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. at 750-51 (citation and internal quotation marks omitted). To have reasonable suspicion based on an anonymous tip, the tip must "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." J.L., 120 S. Ct. at 1379. "The issue is whether the tip, as corroborated by independent police work, exhibited sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." Alabama v. White, 110 S. Ct. 2412, 2414 (1990).

The totality of the circumstances in this case demonstrates that the police had more than an "inchoate and unparticularized suspicion" based on an "anonymous" tip.[2] The tip was consistent with specific facts already discovered during the ongoing investigation into several bank robberies in the area involving three to four black males driving large SUVs. The police also knew of two armed robberies of patrons committed by two black males outside the very branch of

---

[2]The 911 caller identified himself as "Davis" and informed police that he would be at the scene when police arrived. Officers never spoke with or found any caller at the scene.

Wachovia Bank that was across from the location of Defendant's SUV. This independent knowledge corroborated the 911 caller's assertion that the men in the SUV were loading guns into the vehicle across from the bank. In addition, when Officer Tierney's vehicle came into view at the gas station, the SUV's sudden movement from its parked location over to a gas pump gave rise to further suspicion. Thus, rather than reacting to a mere "hunch," the officers engaged in "a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference," as dictated by a potentially dangerous situation.[3] United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000) (quoting United States v. Hardy, 855 F.2d 753, 759 (11th Cir. 1988)).

## B. Probable Cause for Defendant's Arrest

---

[3]Extra facts in this case cause it to differ significantly from the bare-boned-tip situation in Florida v. J.L., 120 S. Ct. 1375 (2000). The Court in J.L. concluded that "an anonymous tip that a person is carrying a gun is, without more, [in]sufficient to justify a police officer's stop and frisk of that person." Id. at 1377 (emphasis added). In this case, the total circumstances, including the 911 caller's tip combined with a location close-by a bank and combined with the fact of an ongoing independent police investigation of recent unsolved armed robberies of banks -- robberies which involved persons of the same sex, race, and number described by the tip and a vehicle of the same general kind as described by the tip -- provided "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." Id. at 1378 (quoting White, 110 S. Ct. at 2414).

9

Defendant next argues that the officers arrested him without probable cause and that the district court, therefore, should have suppressed his post-arrest statements. We disagree. Although probable cause involves a greater certainty of criminal behavior than reasonable suspicion, probable cause does not require the same "standard of conclusiveness and probability as the facts necessary to support a conviction." United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting Wood v. Kesler, 323 F.3d 872, 873 (11th Cir. 2003)). Probable cause to arrest exists when the totality of the facts and circumstances support "a reasonable belief that the suspect had committed or was committing a crime." Gordon, 231 F.3d at 758 (citation omitted).

In addition to the circumstances that gave rise to a reasonable suspicion of illegal behavior to support the initial stop, several facts establish that the police had probable cause to arrest Defendant for being a felon in possession of a firearm.[4] The 911 call provided specific information that the men were loading weapons and placing them into the SUV, which was parked across from the

---

[4]Defendant challenges the magistrate judge's determination that the police had probable cause to arrest Defendant for loitering under Florida law. He claims that if the police truly had probable cause to arrest him for loitering or another crime such as conspiracy to commit bank robbery, the police would not have released the other men that were in the SUV. How the other men were treated, however, is not determinative of whether Defendant was treated lawfully. And even if the police lacked probable cause to arrest Defendant for these other crimes, the police had probable cause to arrest Defendant for being a felon in possession of a firearm at the point they discovered Defendant was a felon and reasonably believed that Defendant's vehicle contained a firearm.

10

Wachovia Bank. After the police had detained the four men, the officers observed an armored car pulling up to the bank and guards loading money into the armored car. The police also discovered that all four men were convicted felons and that the registered owner of the vehicle, Defendant, had a past conviction for armed bank robbery. Peering through the tinted windows of the SUV, officers saw binoculars and what they "believe[d] was a rifle bag."[5] Viewing these events in the light of the ongoing investigation into several armed bank robberies in the area and two specific armed robberies in the parking lot of the same branch of Wachovia Bank, the totality of the circumstances supports the conclusion that the police had probable cause to arrest Defendant. Thus, the post-arrest statements made by Defendant after receiving his <u>Miranda</u> warnings were admissible.

---

[5]After police had confronted Defendant with this evidence, he twice refused his consent to search his vehicle. Defendant claims that the police considered his refusal to consent in violation of his Fourth Amendment rights. We recognize "that a refusal to cooperate [with police], <u>without more</u>, does not furnish the minimal level of objective justification needed for a seizure." <u>Florida v. Bostick</u>, 111 S.Ct. 2382, 2387 (1991) (emphasis added). That the arresting officers subjectively considered Defendant's refusal to consent, however, is not determinative of a court's legal conclusion of whether probable cause existed to justify the arrest. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." <u>Whren v. United States</u>, 116 S. Ct. 1769, 1774 (1996). We have "explicitly rejected the idea that the subjective belief of the arresting officer is relevant to the determination of whether probable cause exists." <u>Rankin v. Evans</u>, 133 F.3d 1425, 1433 (11th Cir. 1998). "Instead, an arrest will be upheld if the objective circumstances justify the arrest." <u>United States v. Jones</u>, 377 F.3d 1313, 1314 (11th Cir. 2004). Based on the totality of the facts and circumstances in this case -- apart from the Defendant's failure to consent to a search -- we conclude that probable cause existed to justify Defendant's arrest. Although we do not consider the refusal to consent, we do not decide today whether the fact of and manner of a refusal to consent to a search can ever count in the "totality of the circumstances" analysis that a court must bear in mind when deciding whether probable cause for a seizure does exist.

## C.  Validity of the Search Warrant

Defendant also contends that the police illegally obtained a warrant to search his SUV because the warrant was not supported by probable cause and because the search warrant affidavit contained several material misstatements that were made knowingly and intentionally or with a reckless disregard for the truth. Defendant argues, therefore, that the district court should have suppressed the evidence retrieved from his vehicle.

We do not reach the issue of whether the search warrant in this case was valid.  We conclude that a warrant was unnecessary to search Defendant's vehicle under the automobile exception to the warrant requirement.  The automobile exception allows the police to conduct a search of a vehicle if (1) the vehicle is readily mobile; and (2) the police have probable cause for the search.  United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003).  The requirement of

mobility is satisfied merely if "the automobile is operational." Id.[6] In addition,

"[t]here is no requirement that the warrantless search of a vehicle occur

contemporaneously with its lawful seizure" or that other "exigent circumstances"

exist. United States v. Johns, 105 S. Ct. 881, 885 (1985).[7] The key issue here is

whether the police had probable cause for the search and seizure of the vehicle.

"Probable cause, in turn, exists when under the totality of the circumstances, there

is a fair probability that contraband or evidence of a crime will be found in the

vehicle." United States v. Tamari, 454 F.3d 1259, 1264 (11th Cir. 2006) (citation

and internal quotation marks omitted).

The police had probable cause to search the vehicle: they knew Defendant

was a felon and that he owned the SUV; and, given the events at the gas station, a

fair probability existed that the vehicle contained a firearm based on the totality of

the circumstances. Because the requirements of the automobile exception are met,

---

[6]Although the original justification for the automobile exception was the exigency of the circumstances, we have "made it clear that the requirement of exigent circumstances is satisfied by the 'ready mobility' inherent in all automobiles that reasonably appear to be capable of functioning." Watts, 329 F.3d at 1286 (quotation marks and citation omitted).

[7]In Johns, the Supreme Court applied the automobile exception to evidence found in two pick-up trucks that were searched three days after DEA officers arrested the occupants and impounded the trucks. Johns, 105 S. Ct. at 884-86. The Court stated that "the justification to conduct such a warrantless search does not vanish once the car has been immobilized. A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify a warrantless search." Id. at 885 (internal citation and quotation marks omitted).

the police could have searched Defendant's vehicle lawfully without a warrant. Therefore, the validity of the search warrant is not important; and the evidence obtained from the SUV was properly admitted.

### D. Destruction of Fingerprint Card and Brady Error

Defendant next alleges that destruction of the fingerprint card with incomplete prints constitutes reversible error under Brady v. Maryland, 83 S. Ct. 1194 (1963).[8] When a defendant does not raise a Brady objection in his motion for a new trial, we need only conduct a plain error review. United States v. Kersey, 130 F.3d 1463, 1465 (11th Cir. 1996). To make a valid claim that the government improperly withheld or destroyed possibly exculpatory evidence under Brady, a defendant also must demonstrate that the government acted in bad faith. Arizona v. Youngblood, 109 S. Ct. 333, 336-37 (1998).

Defendant's claim that the fingerprint card could have been exculpatory is both highly speculative and insufficient to rise to the level of Brady error.

---

[8] Defendant claims that the fingerprint card may have provided some exculpatory evidence for the jury to conclude that someone other than Defendant placed the gun in the vehicle.

Defendant admitted that he owned the gun and that he placed it inside the SUV. Furthermore, Defendant has produced no evidence that the fingerprint examiner acted in bad faith in destroying the fingerprint card. The district court did not plainly err by relying on the government's evidence that this act was pursuant to a routine procedure of throwing out fingerprint cards containing no valuable information to make an identification. Thus, Defendant has shown no Brady error.

### E. Evidence of Uncharged Criminal Activity

At trial, the prosecution introduced evidence that Defendant was planning a bank robbery, including the testimony of a jailhouse acquaintance that Defendant had admitted the plan. Defendant now claims that this evidence was improperly introduced as evidence of bad character. We review a district court's decision to admit evidence under Fed. R. Evid. 404(b) for a clear abuse of discretion. United States v. Paradies, 98 F.3d 1266, 1291 (11th Cir. 1996).

In this case, the district court did not abuse its discretion in admitting evidence of Defendant's plan to commit an armed robbery in or around the bank. This evidence was admissible to establish that Defendant knowingly possessed the

weapon and ammunition and that he had a motive for doing so. Also, evidence of a plan to rob a bank was inextricably intertwined with possession of the firearm and was necessary to complete the story of the crime. Admission of this evidence for these purposes is valid under Fed. R. Evid. 404(b).

## F. Sentencing Errors

Defendant claims that the district court improperly sentenced him as an armed career criminal because his prior convictions and alleged conspiracy to commit bank robbery were neither charged in the indictment nor proved to a jury beyond a reasonable doubt.[9] Defendant also argues that a sentence of 300 months' imprisonment was unreasonable under Booker v. United States, 125 S. Ct. 738 (2005). We review a district court's application of the Sentencing Guidelines de novo and factual findings for clear error. United States v. Wilks, 464 F.3d 1240, 1242 (11th Cir. 2006).

---

[9]Defendant also contends that classifying his prior convictions as either a violent felony or a serious drug offense must be alleged in the indictment and proved to a jury. But, the nature and fact of a prior conviction are for the district court's determination. United States v. Greer, 440 F.3d 1267, 1274-76 (11th Cir. 2006). Because Defendant never objected to the fact of his prior convictions or their classification as violent felonies in the PSI, he is deemed to have admitted these findings. United States v. Shelton, 400 F.3d 1325, 1330 (11th Cir. 2005).

Defendant's claims of error during sentencing must fail. Nothing in <u>Booker</u> disturbed the Supreme Court's holding in <u>Almendarez-Torres v. United States</u>, 118 S. Ct. 1219 (1998), that a district court may rely on prior convictions to enhance a defendant's sentence even if not alleged in the indictment or proved to a jury. <u>United States v. Shelton</u>, 400 F.3d 1325, 1329 (11th Cir. 2005). Furthermore, in calculating the appropriate advisory guideline range, <u>Booker</u> does not forbid a district court from considering criminal acts for which a defendant has not been charged or has been acquitted as long as those acts are proved by a preponderance of the evidence. <u>United States v. Faust</u>, 456 F.3d 1342, 1347 (2006). In this case, the district court complied with <u>Booker</u> by treating the sentencing guidelines as advisory and examining the section 3553(a) factors to determine a proper sentence. We conclude, therefore, that the district court did not abuse its discretion in considering Defendant's prior convictions and an alleged conspiracy to commit bank robbery. We also conclude that Defendant's sentence of 300 months' imprisonment was reasonable.

AFFIRMED.

17

BARKETT, Circuit Judge, dissenting:

I dissent because I believe that the police lacked reasonable suspicion to seize Anthony Lindsey at gunpoint, and that his extended, handcuffed detention thus amounted to an unlawful search and seizure.

Officers conducting "stop and frisk" seizures must "have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000). To determine whether reasonable suspicion existed to justify a stop, we must look only to the information that the police had at the moment of detention, not that which was discovered after the fact.

In this case, there was no "reasonable, articulable suspicion based on objective facts" that Anthony Lindsey had engaged in, or was about to engage in, criminal activity when he was stopped. The purported reasonable suspicion arose solely from a tip delivered by an anonymous caller, who, although he said his name was "Davis," was completely unknown to the police. The anonymous tipster reported that four black men were loading guns into a white SUV in the parking lot of a Mobil gas station across the street from a Wachovia bank. This tip was virtually identical to the tip which the Supreme Court found to be insufficient to support a Terry stop in Florida v. J.L., 529 U.S. 266 (2000). See Terry v. Ohio,

18

391 U.S. 1 (1968).  In J.L., an unidentified tipster reported that a young black man wearing a plaid shirt was sitting at a bus stop and was carrying a gun. The Court explicitly found that a stop and frisk based on this tip was illegal because the officers' suspicion "arose not from any observations of their own," id. at 270, but rather from the anonymous tip.  The Court made its holding unmistakably clear: "The question presented in this case is whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person. We hold that it is not." Id. at 268.

The Court held that such a tip was insufficient to permit even a Terry investigatory stop because it was not reliable.  The requisite reliability of a tip sufficient to support suspicion that a crime is about to be committed has to be satisfied in one of two ways.  Either the tip must come from a "known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated." Id. at 270 (emphasis added) (quotation and citation omitted). Or the content of the tip must include accurate predictive information which is verified by the subsequent observations of the detaining officer. Id. at 271.  That is, the tip itself must show that the tipster has sufficient familiarity with the fact that criminal activity "may be afoot," in that the tipster is able to relate the future movements or actions of the prospective detainee that are

not easily predictable, and which the police verify through independent observation before the stop. In either case, police must have some way to assess whether the information given in the tip is sufficiently reliable for constitutional purposes to justify a police seizure.

In the first instance, if an informant is "known," police can be reasonably satisfied that the tip is reliable based on the informant's past delivery of accurate information. See Adams v. Williams, 407 U.S. 143, 148-49 (1972) (sustaining a Terry stop undertaken on the basis of a tip given in person by a known informant who had provided accurate information in the past); see also Alabama v. White, 496 U.S. 325, 328 (1990) (citing Adams, 407 U.S. at 146-47). Moreover, informants with known identities can be held accountable if the information they provide is false or intentionally misleading, J.L., 529 U.S. at 270, giving them incentive to be honest.

In this case there was no "known" informant. Giving himself a name does not transform a tipster into a "known informant whose reputation can be assessed and who can be held responsible if [his] allegations turn out to be fabricated." J.L., 529 U.S. at 270 (citation omitted). Self-identification by name alone is meaningless when no information is available to verify whether the self-identification is true or false. The police did not know "Davis," had never dealt

20

with "Davis" before, and did not even know if "Davis" was a real name. They never looked for the caller, and never received any additional information from or about him. The police thus had no basis on which to assess the caller's reputation or information, and no way to hold him accountable if his allegations turned out to be fabricated.[1]

In the second instance, if a tip comes from an unknown person, reliability may be based on the fact that the tipster shows inside knowledge of criminal activity by accurately predicting the subject's behavior, which is then verified by police observation. Simply describing a subject is not enough. As the Court made clear in J.L., requiring either that the informant be known and reliable from past dealings, or that the tipster, if anonymous, provide predictive future behavior, guards against the unwitting misuse of the police power. A vindictive person, or merely a mistaken person, should not be able to effectuate the seizure of another by simply calling the police, describing the object of their malice or their mistake, and conclusorily stating that a crime is being, or going to be, committed by him.

Because "Davis" was not a known informant, the information the police received from him could not justify a Terry stop unless the tip made

---

[1] Indeed, in this case, the tipster's information was false. No "guns" appear to have been loaded into this SUV—the only gun found was a handgun in the console, which provided the basis of the charges against Lindsey.

predictions—not merely descriptions— which could be tested by subsequent

police investigation. In discussing <u>Alabama v. White</u>, the Supreme Court in <u>J.L.</u>

explained its jurisprudence on this point:

> In <u>White</u>, the police received an anonymous tip asserting that a woman was carrying cocaine and predicting that she would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named motel. <u>Standing alone, the tip would not have justified a Terry stop. Only after police observation showed that the informant had accurately predicted the woman's movements</u>, we explained, did it become reasonable to think the tipster had inside knowledge about the suspect and therefore to credit his assertion about the cocaine. Although the Court held that the suspicion in <u>White</u> became reasonable <u>after police surveillance</u>, we regarded the case as borderline. Knowledge about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband. We accordingly classified <u>White</u> as a "close case."

<u>J.L.</u>, 529 U.S. at 270-71 (emphasis added) (internal citations omitted). The Court

then took great pains to clarify that the relevant question is not whether the

tipster's description of what he or she is seeing is accurate, but rather whether

there are accompanying <u>predictions</u> of future actions which are then found to be

accurate through subsequent police surveillance or investigation so as to make the

tip <u>reliable</u>.  The tip in <u>J.L.</u> "lacked the moderate indicia of reliability present in

White and essential to the Court's decision in that case" because it "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." J.L., 529 U.S. at 271. Similarly, in Illinois v. Gates, another tip case, the Court pointed to the fact that "the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." 462 U.S. 213, 245 (1983) (emphasis added). See also White, 496 U.S. at 332 (pointing to "independent corroboration by the police of significant aspects of the informer's predictions [which] imparted some degree of reliability to the other allegations made by the caller") (emphasis added).

Thus, the "reliability" of the tip does not relate to whether the tip accurately describes a particular person. The relevant inquiry is whether the tip is reliable in its ability to describe criminal activity. As the Court noted in J.L.:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

529 U.S. at 272 (emphasis added).

Nor does it make a difference that the description includes the presence of a firearm. There is no firearm exception to the reliability requirement. When the argument was made in J.L. that a tip alleging an illegal gun should justify a stop and frisk even if the accusation would fail standard pre-search reliability testing, the Supreme Court plainly stated: "We decline to adopt this position." Id.

Because the tip which formed the basis of the seizure here was not reliable—that is, it did not come from a known informant, nor did it provide predictive information which could be verified by police investigation—it cannot, under J.L., be used to support reasonable suspicion. Both tips came from sources unknown to the police and described a person's race, location, alleged possession of a firearm and an additional purported identifying characteristic—a plaid shirt in J.L. and a white SUV here. Neither tip demonstrated a "knowledge of concealed criminal activity." If the tip in J.L. could not support reasonable suspicion, the tip in this case cannot do so either.

The majority attempts to avoid the reach of J.L. by saying that the police relied on more than the anonymous tip. Specifically, the majority says that "the 911 caller's tip combined with independent police investigation of recent bank robberies provided sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." First, a continuing "investigation" of an unsolved

24

crime has nothing to do with the investigation required by J.L. in order to permit reliance on a tip. The investigation required by J.L. is an investigation of the tip itself. That is, the police must conduct investigation to verify that the predicted suspicious activity relayed in the tip does in fact occur. The fact that the police department had ongoing open investigations of unsolved crimes is irrelevant here. The only things connecting these men to the unsolved crimes were their race and gender, and the fact that they were in a large vehicle. This is surely a common occurrence in West Palm Beach.

Moreover, the fact that the City of West Palm Beach had unsolved bank robberies which were still under investigation adds absolutely nothing to warrant reasonable suspicion that these four black men had anything to do with them. Prior commission of bank robberies in West Palm Beach by black men surely cannot be sufficient to justify the detention of any group of black men in large vehicles at gas stations located near banks. Such a view essentially justifies the immediate seizure of any citizen accurately described by an unknown tipster of indeterminate reliability, so long as that description also happens to match the race and gender of suspects from unsolved crimes. Under this test, "[a]nybody with enough knowledge about a given person to make her the target of a prank, or to

25

harbor a grudge against her, will certainly be able to formulate a tip" which could result in an improper seizure. See White, 496 U.S. at 333 (Stevens, J., dissenting).

Nor did the officers observe Lindsey and his companions engage in any suspicious activity. When Sergeant Tierney first saw Lindsey, he was in a white SUV which was simply pulling up to a gas pump from a parked position at a gas station. At this point, Tierney, who was aware that bank robberies had been committed in the city,[2] knew only that an anonymous caller had reported that four black men were loading guns into a white SUV in the parking lot of a Mobil gas station across the street from a Wachovia bank. There had been no description of what these men were wearing nor of any of their physical characteristics beyond that they were black and were in a white SUV. Tierney saw a white SUV pulling out of a parking space in the gas station up to the gas pump and four black males

---

[2] Sergeant Tierney, the first officer on the scene, testified that he was concerned about the possibility of weapons "where the caller had indicated that they were loading weapons in the car," and "[t]he proximity to the bank and with the history we had had as far as the bank takeovers." Tierney did not testify as to the details of any of these bank robberies, and there is no evidence in the record that he knew anything about the robberies—including even the race and gender of the robbers—other than that they had occurred.

Detective Jason Houston, who arrived on the scene at least ten minutes after Sergeant Tierney had detained the four men at gunpoint, testified that there had been four bank robberies in West Palm Beach between October and December of 2003, though none had occurred between December and February 2004, the date of Lindsey's arrest. The bank robberies were conducted by three or four black men who would enter the bank masked and armed with long guns. Although, "larger" vehicles were used, **no** white SUV was ever described as being used in one of these robberies, In addition, Houston testified that a Wachovia customer was robbed in the parking lot of the bank by two black men using a handgun in September 2003.

exit the car. While one of the men opened the hood and began looking inside, Lindsey and the other two men walked toward the convenience store. Neither Tierney nor anyone else observed anything suspicious or out of the ordinary in their actions, nor saw any bulges or other indicia that the men were carrying weapons. Nonetheless, without stopping to ask any questions or waiting to observe any of the men's actions or behavior, Tierney jumped out of his car with his shotgun drawn, yelling at the men to get down on the ground. At the same time, seven other officers in five or six separate vehicles surrounded the men, likewise yelling at them to get down with their weapons drawn and pointed. Ultimately, eight officers drew their weapons and detained Lindsey and his companions in handcuffs for approximately 45 minutes[3] before "formally"[4]

---

[3] It appears from the record that Sergeant Tierney drew his weapon and forced the men to the ground at approximately 10:40 a.m., and that the other three men were released at approximately 11:30, so his detention lasted in the range of 45 minutes to one hour.

[4] The Supreme Court told us quite clearly in Terry that we must determine "whether [the] search and seizure of petitioner were reasonable, both at their inception and as conducted." 329 U.S. at 27-28. The manner in which this seizure was effectuated—where seven or eight officers brandishing guns forced Lindsey and his companions to prostrate themselves on the ground and immediately handcuffed them, despite the fact that none of the officers had observed any suspicious behavior or possible weapons—exceeded the bounds of Terry and constituted an arrest requiring probable cause. A Terry stop "cannot continue for an excessive period of time . . . or resemble a traditional arrest." Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 186 (2004) (citations omitted); see also Florida v. Royer, 460 U.S. 491, 500 (1983) ("This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.").

arresting Lindsey and releasing the other three men. This is not the kind of "investigation" contemplated by the Supreme Court in White and Terry. The officers' actions made clear that the putative Terry stop was not designed to quickly confirm their suspicions of Lindsey's dangerousness. To the contrary, the officers had already reached that conclusion based merely on the anonymous and completely unreliable tip.

In this case, neither the tip nor the fact that there were open investigations of bank robberies provided reasonable suspicion sufficient to justify any seizure. It is certainly possible that if the officers had investigated the tip further, they might have personally observed suspicious behavior giving rise to the reasonable suspicion needed for a Terry stop, which might then have led to the probable cause needed for an arrest. They did not, however, and we cannot retroactively find reasonable suspicion where none existed.

For the foregoing reasons, I respectfully dissent.