[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-12388
Non-Argument Calendar
_____

D.C. Docket No. 2:11-cr-00031-LGW-JEG-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAMIAN JULIAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(December 12, 2012)

Before HULL, MARCUS and KRAVITCH, Circuit Judges.

PER CURIAM:

After pleading guilty, Damian Julian appeals his conviction for traveling in

interstate commerce with the intent to promote, manage, establish, or carry on unlawful activity (a cocaine distribution conspiracy), in violation of 18 U.S.C. § 1952(a)(3).[1]  On appeal, Julian challenges the district court's denial of his motion to suppress evidence that $21,015 in cash was found on the front seat of a vehicle he was driving.  After review, we affirm.

## I.  BACKGROUND

### A.    Offense Conduct

On November 27, 2007, Investigator William Woolard of the Camden County Sheriff's Office was patrolling Interstate 95 ("I-95") in Camden County, Georgia.  Woolard was on patrol as part of a heightened drug interdiction program, and he knew that I-95 was a known drug corridor.  Woolard initiated a traffic stop of a green Chevrolet Impala that Woolard observed failing to maintain a single lane.  Defendant Julian was driving the Impala and was the sole occupant.

Woolard approached the vehicle and requested Julian's driver's license. Woolard then learned that the Impala was a rental car, and that Julian was neither the renter nor an authorized driver.  The rental agreement listed Sharon Miller as the renter.  Although it appeared that the rental agreement was expired, Julian told Woolard that he had just renewed it.

---

[1]Julian does not appeal his 60-month sentence.

Woolard explained to Julian why he pulled him over, and Julian stated that his car "was pulling." Woolard asked Julian if he had been arrested before, and Julian replied that he had been arrested for smoking marijuana. Julian further stated, in response to Woolard's questions, that he was traveling from Florida to a recording studio in Brunswick, Georgia, and that he was a music producer who traveled frequently. Julian, however, could not provide the studio's street address. Julian did know that it was located "off of Exit 38" and offered to take Woolard there.

Following this initial period of conversation, Woolard asked Julian if he could search the Impala. Julian gave his consent. On appeal, Julian does not challenge the district court's findings that he consented to the search of the Impala and that Woolard had probable cause for the traffic stop—namely, Julian's failure to maintain a lane and use a turn signal. Rather, Julian challenges only the denial of his motion to suppress evidence of the cash found in the Impala.

During the search, Julian stood behind the Impala with his back to it (i.e., in front of and facing Woolard's patrol car), a position that Woolard thought was unusual, since "[m]ost people when you go inside their vehicle they want to watch you do it." In his search of the Impala, Woolard found a cardboard box on the front passenger seat that contained some loose cash, as well as twenty bundles of

3

cash wrapped in rubber bands.  Woolard did not find any receipts or other paperwork related to the money in the Impala.  Woolard took the box out of the Impala, placed it on the hood of his patrol car, and removed the bundles of money.

Upon discovering the funds, Woolard also detained Julian by handcuffing him and placing him in the backseat of his patrol car.  Woolard then requested additional police assistance, and other law enforcement officers, as well as a police dog, came to the site of the traffic stop.  Woolard, along with the other law enforcement officers, conducted a more extensive search of the Impala.  No other suspicious items or contraband were discovered.  There is no indication that the police dog gave a positive alert on either the cash or the Impala.

After Woolard gave Julian Miranda[2] warnings, Woolard asked him how much money was in the box.  Julian responded that the money totaled approximately $20,000.00, and that he had earned it by producing records.  Julian did not have any receipts or paperwork documenting the source of the cash.

Woolard later testified that, each time he asked Julian a question, Julian "would look down and away."  Julian stood with his arms folded the entire time, which Woolard considered unusual because most drivers typically let their arms rest at their sides and were generally more relaxed.  Woolard also observed that

---

[2]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

the muscles around Julian's eyes were twitching. However, Julian's overall demeanor was calm, and he cooperated with Woolard during the traffic stop.

After Woolard completed the search and concluded the traffic stop, he permitted Julian to leave. Woolard took possession of only the cash, later counted and determined to be a sum of $21,015. Woolard later testified that he explained to Julian that the money was not being returned because Woolard had seen no paperwork substantiating its origin and did not know where it had come from, or "if [Julian had] robbed a bank." Woolard also had been unable to verify Julian's occupation or source of income, other than by a business card provided by Julian, as there was nothing else in the car to substantiate Julian's claim that he was a music producer. Woolard further testified that he had several times before found drugs along with large sums of cash that were wrapped in rubber bands in $1,000-increments, similar to the cash found in the Impala.

Following the seizure of the cash, law enforcement took that cash to a bank and had it converted into a cashier's check. This money was later forfeited pursuant to administrative proceedings after no one came forward to claim it. The forfeiture of the money is not challenged in this appeal either. Again, the only issue is the suppression of the cash in the criminal case against Julian.

**B.     Procedural History**

Over three years after the traffic stop, in March 2011 Julian was charged in a 21-defendant, 4-count indictment that related to a large drug distribution conspiracy.  However, as explained below, the indictment was later dismissed as to Julian, and he ultimately pled guilty to a 1-count information that contained only the § 1952(a)(3) charge at issue in this criminal case.

Prior to pleading guilty to the information, Julian filed a motion to suppress the cash seized during the traffic stop.  Julian asserted that Woolard's seizure of the cash from the Impala was not supported by probable cause to believe that the cash was linked to drugs or other illegal activity.

Following an evidentiary hearing and supplemental briefing by both parties, the district court denied Julian's motion to suppress the cash.  Specifically, the district court identified the following seven factors that, under the totality of the circumstances, provided probable cause to believe that the cash was connected to an illegal drug transaction: (1) the substantial value of the cash; (2) the condition of the funds, which had been "rubber-banded into bundles [and] concealed in a worn cardboard box"; (3) Julian's admission to a previous narcotics arrest; (4) I-95, the road on which Julian was traveling when Woolard initiated the traffic stop, was a known drug corridor; (5) Julian's unusual, nervous behavior during the

6

stop; (6) Julian's ambiguous travel plans; and (7) the fact that Julian was driving a rented car, and he was not an authorized user of that car under the rental agreement.

Thereafter, the government and Julian entered into a plea agreement. The government filed an information under a new case number, charging Julian with one count of traveling in interstate commerce with the intent to promote, manage, establish, or carry on unlawful activity (a cocaine distribution conspiracy), in violation of 18 U.S.C. § 1952(a)(3). Julian pleaded guilty, pursuant to the written plea agreement, and waived his right to an indictment.

In the plea agreement, Julian reserved his right to appeal the district court's denial of his motion to suppress the cash evidence. The initial indictment was dismissed as to Julian upon the government's motion. The district court accepted Julian's guilty plea, adjudicated Julian guilty of the information's sole count, and sentenced him to 60 months' imprisonment. Thereafter, Julian filed this appeal.

## II. DISCUSSION

On appeal, Julian argues that the district court erred in denying his motion to suppress evidence of the $21,015.00 seized from his car during the traffic stop. He asserts that, under the totality of the circumstances, Investigator Woolard did not have probable cause to seize the funds as drug proceeds, and thus, the cash

7

evidence should have been suppressed.[3]

## A.    Our Precedent

A seizure occurs when there is a meaningful interference with a person's possessory interest in property.  United States v. Virden, 488 F.3d 1317, 1321 (11th Cir. 2007) (holding that the non-consensual seizure of the defendant's vehicle was unreasonable absent probable cause because of its scope and intrusiveness, including because the seizure was accomplished by moving the vehicle to a new location for the purposes of investigation).  A warrantless seizure of personal property in plain view is permissible under the Fourth Amendment where officers have probable cause to believe that the property is contraband.  See United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006).  Probable cause is a "reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion."  United States v. $242,484.00, 389 F.3d 1149, 1160 (11th Cir. 2004) (en banc) (internal quotation marks omitted) (addressing the civil forfeiture statute, 21 U.S.C. § 881(a)(6), which uses a probable cause standard identical to that employed in criminal cases involving seizures).

In determining whether probable cause existed at the time of a seizure of

---

[3]A district court's ruling on a motion to suppress presents a mixed question of law and fact, and we review the application of law de novo and the findings of fact for clear error.  United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007).  In so doing, we view the facts "in the light most favorable to the prevailing party in [the] district court."  Id.

alleged drug proceeds, we evaluate whether, given a commonsense view of "the realities of normal life" and the totality of the circumstances, there is "probable cause to believe that the money is the proceeds of, or is otherwise connected to, any illegal drug transaction." Id. Even where the evidence presented by the government would support an alternative hypothesis for the source of funds, this does not prevent the evidence from being probative on the issue of probable cause. Id. Furthermore, we have rejected the argument that probable cause was negated, as to money seized as drug proceeds, because no drugs were found in the search that uncovered the money. See United States v. $41,305.00 in Currency & Traveler's Checks, 802 F.2d 1339, 1343 (11th Cir. 1986) (noting that "[o]ne may expect a drug dealer to have drugs or money or both on hand").

In $242,484.00, this Court affirmed the district court's ruling that the government established probable cause that the cash seized from Deborah Stanford was drug proceeds. 389 F.3d at 1160, 1168. Stanford was carrying a large amount of currency, which was rubber-banded into bundles in a backpack, a method of transportation not used by legitimate businesses. Id. at 1160-62. The cash was sealed in cellophane and Christmas wrapping paper, a technique used by couriers to prevent detection by drug-sniffing dogs and to conceal money. Id. at 1162. Stanford was traveling between New York and Miami, a flight corridor

9

often used by drug organizations, and she purchased her ticket in cash and twice changed her return date. Id. at 1162-63. Additionally, Stanford was not able to tell agents who gave her the cash, where she picked it up, or where she stayed in New York, and she told agents two conflicting stories about why she went to New York and could produce no supporting documentation for either story or the money. Id. at 1163-65. A dog trained to detect narcotics alerted on the bag containing the currency. Id. at 1165-66. Finally, no one ever came forward to claim the money. Id. at 1167-68.

In United States v. $121,100.00 in U.S. Currency, 999 F.2d 1503 (11th Cir. 1993), this Court held that the large quantity of cash seized from Frederick Foster, although insufficient by itself to establish probable cause, was highly probative of a connection to illegal activity. Id. at 1505-07. Foster, who was intercepted by law enforcement agents at the airport, paid for his round-trip ticket from Atlanta to New York with cash under a false first name. Id. at 1505, 1507. Moreover, he carried more than $100,000.00 for a single-day trip and appeared nervous when questioned by agents. Id. at 1507. Finally, Foster had a history of narcotics arrests and convictions, including at least three convictions for controlled substance offenses. Id. at 1507-08.

In United States v. Boyce, 351 F.3d 1102 (11th Cir. 2003), the case that

10

Julian urges controls here, this Court concluded that the arresting officer lacked reasonable suspicion of criminal activity to detain the defendant motorist beyond the initial traffic stop. Id. at 1107-08. Although the officer testified that the defendant was unusually nervous during the stop, a videotape of the stop belied the officer's testimony, such that the district court clearly erred in finding that the defendant was unusually nervous. Id. at 1108-09 (explaining the videotape contradicted the officer's assertions that the defendant sweated profusely, was particularly talkative, and paced). Furthermore, although the officer found the defendant's travel plans to visit an ex-girlfriend suspicious, the defendant explained why he was visiting her and such travel plans did not suggest any criminal activity. Id. at 1109. We concluded that the only two remaining factors, that the defendant was traveling through a known drug corridor in a rental car and that he was planning to return the car two days late, were insufficient under the totality of the circumstances to show reasonable suspicion to support the defendant's detention. Id. at 1109-10.

**B.    Facts in Julian's Case**

Here, under the totality of the circumstances, we conclude that probable cause existed for the seizure of $21,015 in cash from the car Julian was driving. Although all seven factors identified by the district court, taken together, support a

11

finding of probable cause, the most probative of these factors are the condition of the funds and their substantial value.  At the time of the traffic stop, Julian was in possession of a significant amount of cash, the vast majority of which had been rubber-banded into 20 separate bundles of $1,000 each and concealed inside of a cardboard box, and "[a] common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages." $242,484.00, 389 F.3d at 1161.  Julian had no paperwork, bank receipts, or any documentation whatsoever concerning the source of the funds.  Although Julian provided an explanation for the cash's origin, the fact that his explanation could support an alternative hypothesis does not prevent the lack of documentation from being probative on the issue of probable cause. See id.

In addition, unlike in Boyce, the video of the traffic stop in the present case did not belie Woolard's testimony.   Woolard himself testified that although Julian was calm and cooperative, he exhibited some signs of nervousness, including looking down and away while speaking, holding and folding his arms across his chest, and watching his car only minimally during Woolard's search.  Woolard testified that he had conducted between two and three thousand traffic stops during his career, and the district court properly gave some weight to Woolard's

12

inferences regarding Julian's behavior.  See $242,484.00, 389 F.3d at 1162.

The other facts found by the district court, though not as probative as the amount of cash, the condition of the cash, and Julian's behavior, support the district court's finding of probable cause.  Julian was traveling down a known drug corridor in a rental car for which he was neither the renter nor the authorized driver, and he admitted to a prior drug-related arrest. See id. at 1167; cf. $121,100.00 in U.S. Currency, 999 F.2d at 1507-08 (noting that the individual from whom the defendant currency was seized had a history of narcotics arrests and convictions, but focusing on his convictions for controlled substance offenses).  Finally, Julian could not provide Woolard with the address of his destination in Brunswick, and while this failure on Julian's part is distinguishable from the suspicious travel plans at issue in  $242,484.00 and $121,100.00 in U.S. Currency, the district court nevertheless was permitted, under the totality of the circumstances, to take this factor into consideration in making its probable cause determination.  See $242,484.00, 389 F.3d at 1160.[4]

Accordingly, in light of the foregoing, and after our careful review of the

---

[4]We also note that, while Julian contended during the traffic stop that the cash belonged to him, the fact that no person came forward to claim the funds in the administrative forfeiture proceedings is another factor, one not considered by the district court, that further supports a finding of probable cause to believe that the cash was drug proceeds or was otherwise connected to drug activity.  See United States v. $242,484.00, 389 F.3d 1149, 1167-68 (11th Cir. 2004) (en banc).

13

record and briefs in this case, we affirm the district court's denial of Julian's

motion to suppress the $21,015 cash evidence seized from the car Julian was

driving.[5]

**AFFIRMED.**

---

[5]We recognize that the government alternatively argues that even if Woolard erroneously seized the cash itself, he still would have been able to testify as to: (1) the circumstances surrounding the traffic stop, including the factors that supported the district court's probable cause finding; (2) his discovery of the box; (3) details concerning the nature of its contents, which he learned during the course of the lawful search prior to the seizure; and (4) Julian's admission to him that the box contained about $20,000, even if testimony regarding the exact sum of money would have been excluded. Based on this argument, the government reasons that any seizure error was harmless. We need not reach the issue of harmless error, however, because there was no error in the present case.