[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10660

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DARRYL LEE CHANDLER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:22-cr-00272-ACA-NAD-1

_____

2                    Opinion of the Court                    24-10660

Before BRASHER, ABUDU, and ED CARNES, Circuit Judges.

PER CURIAM:

Darryl Lee Chandler pleaded guilty to possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1).  He preserved a challenge to his conviction based on the district court's denial of his motion to suppress evidence of the firearm, which an officer found on him after the officer asked him to exit his vehicle during a traffic stop.  The officer's actions were based on reasonable safety concerns and were supported by a reasonable suspicion of ongoing criminal activity.  The district court did not err in denying Chandler's motion to suppress.  We affirm.

## I. BACKGROUND

On January 12, 2022, Officer Jason Seibert was patrolling without a partner in a marked police vehicle in Tuscaloosa, Alabama, when he came up behind a red Toyota Camry.[1]  As Officer Seibert followed behind the car, the driver did not use the car's turn signal when he turned right at a stop sign.  The officer then noticed the car's occupants glancing in the car's mirrors or turning around to look at him.  He also perceived that they were arguing with each

---

[1] In our review of the district court's denial of Chandler's motion to suppress evidence, "we construe the facts in the light most favorable to the prevailing party — here, the government."  *See United States v. Stancil*, 4 F.4th 1193, 1195 n.1 (11th Cir. 2021).

other. He ran the car's tag and found that it was a "switched tag," meaning the tag was registered to a different vehicle.

After following the car as it made a couple of turns and determining that its driving was "not typical," Seibert turned on his police lights and stopped the car. He later testified that the "basis" for stopping the car was the driver's failure to signal and the switched tag.

Officer Seibert approached the car and began to explain the reason for the stop. But Chandler, the car's driver, cut him off and asked what he had done wrong. According to Officer Seibert, Chandler seemed nervous and defensive. In Officer Seibert's words, Chandler's "hands were shaking and his breathing was quick, his speech was more rapid than normal . . . [and] when I . . . asked him if he was intentionally dodging me [i.e., evading my (Seibert's) questions], he said he was because he doesn't like the police." Chandler also mentioned that he had "just got out" of prison. Officer Seibert did not recognize Chandler but he recognized the other two passengers in the car as having been involved in "criminal activity" before.

Officer Seibert told Chandler that the car had a switched tag, and that the owner of the tag had an outstanding arrest warrant. Chandler responded that the vehicle was not his. Seibert then asked Chandler for his license and insurance, which Chandler provided. Before Seibert checked the license or insurance, he asked Chandler if there were any firearms or knives in the car, and Chandler replied that he could not have a firearm because he was a felon.

Chandler also explained to the officer that he was on his way to deliver a note to his wife because he was divorcing her for cheating on him. And he stated that he had his wife's phone.

At that point, as Officer Seibert later testified, he was concerned that both the car and the phone might have been stolen, and he asked Chandler to step out of the car. According to Officer Seibert, he suspected that the car might have been stolen because a switched tag is typical on stolen vehicles, even though at the time that Seibert asked Chandler to step out of the car, Seibert had not received a report of a stolen red Camry, checked Chandler's license, or asked Chandler if the car was stolen. Nor had Officer Seibert run the car's vehicle identification number, because, according to him, he normally did that only after asking an occupant to step out of a potentially stolen car. Officer Seibert did not see a firearm in the car before asking Chandler to exit it.

Chandler complied with Officer Seibert's request and got out of the car. Once outside of the car, Chandler asked if he could get a cigarette to smoke from his pocket and Officer Seibert responded that he could. But Seibert told Chandler that he "was going to get everything out of [Chandler's] pockets" before Chandler placed his hands there. The purpose of that request was to cover concerns over "officer safety" before Chandler "reach[ed] in his pockets." Chandler then confessed that he actually did have a gun in his possession, removed it from his waistband, and handed it to Officer Seibert. After that, Officer Seibert arrested Chandler.

24-10660          Opinion of the Court          5

A federal grand jury indicted Chandler for one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  Chandler moved to suppress the firearm that Officer Seibert found on him after he exited the car, arguing that Seibert violated his Fourth Amendment right to be free from unreasonable searches or seizures when Officer Seibert asked him to get out of the car.  He contended that Officer Seibert unreasonably prolonged the traffic stop without reasonable suspicion that an independent crime had been committed other than the alleged crimes that formed the basis for the stop.

A magistrate judge recommended that Chandler's motion to suppress be denied.  Chandler objected to the magistrate judge's report and recommendation, challenging the magistrate judge's reasoning that Officer Seibert did not violate Chandler's Fourth Amendment rights when he instructed Chandler to exit the car based on: (1) Seibert's legitimate safety concerns; or (2) Seibert's reasonable suspicion of other criminal activity, including that the car was stolen.

The district court accepted the magistrate judge's recommendation to deny the motion to suppress.  It found that Seibert did not unlawfully prolong the traffic stop when he instructed Chandler to get out of the car because Seibert had legitimate safety concerns and had reasonable suspicion that the car was stolen.  It therefore denied Chandler's motion to suppress.

After accepting his guilty plea and entering judgment, the district court sentenced Chandler to 79 months in prison followed

by 3 years of supervised release.  Chandler appeals the denial of his motion to suppress.

## II. DISCUSSION

"We review a district court's denial of a motion to suppress evidence as a mixed question of law and fact, with rulings of law reviewed *de novo* and findings of fact reviewed for clear error, in the light most favorable to the prevailing party in district court." *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects[] against unreasonable searches and seizures."  U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  As a sort of seizure, a traffic stop requires the police to have a reasonable suspicion that the occupants have violated a law.[2] *See Heien v. North Carolina*, 574 U.S. 54, 60 (2014); *United States v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022) (en banc).  An officer who has "reasonable

---

[2] Reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence" and less than probable cause.  *Pruitt*, 174 F.3d at 1219 (quotation marks omitted).  Instead, under a reasonable suspicion standard, a reviewing court must determine whether the officer had a "particularized and objective basis for suspecting legal wrongdoing" based on the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks omitted).  We give "due weight to the officer's experience" when "examining the totality of the circumstances." *United States v. Braddy*, 11 F.4th 1298, 1311 (11th Cir. 2021) (quotations marks omitted).

suspicion to make a traffic stop" may not "detain a person indefinitely." *Campbell,* 26 F.4th at 881.

The lawful duration of a valid traffic stop is initially determined by the stop's "mission," which is to address the traffic violation that warranted the stop and attend to related safety concerns. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). And "officers conducting a traffic stop may take such steps as are reasonably necessary to protect their personal safety." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (quotation marks omitted and alteration accepted). Ensuring officer safety "stems from the mission of the stop itself." *Rodriguez*, 575 U.S. at 356.

Chandler does not challenge the lawfulness of the initial traffic stop. Instead, he contends only that the lawful stop was unlawfully extended when the officer asked him to get out of his vehicle. And he argues that the gun found on him as a result of the unlawfully prolonged traffic stop should have been suppressed.[3]

Ordering the occupant of a stopped car to step outside of the vehicle is within the scope of an officer's tasks incident to a traffic stop. In *Rodriguez* the Supreme Court recognized that "an officer may need to take certain negligibly burdensome precautions" to safely complete his mission, which can include "requiring a driver, already lawfully stopped, to exit the vehicle." *See* 575 U.S. at

---

[3] Chandler does not contend that Officer Seibert committed any independent Fourth Amendment violation by asking him to empty his pockets, other than that, by requesting him to empty them, it also added time to the traffic stop.

356 (distinguishing an officer's unlawful decision to prolong a stop to conduct a dog sniff from an officer's lawful instruction for the occupant of a lawfully stopped car to step out of the car for officer safety, as established in *Pennsylvania v. Mimms*); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977); *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). Given the danger to officers inherent in traffic stops, Officer Seibert was permitted as part of his mission in the stop to take the "negligibly burdensome precaution" of asking Chandler to exit the car so that he could address Chandler's traffic violation. *See Rodriguez*, 575 U.S. at 356.

Additionally, the totality of the circumstances supports the officer's decision to ask Chandler to get out of his car. *See Arvizu*, 534 U.S. at 273. We give "due weight" to Officer Seibert's experience when "examining the totality of the circumstances." *See Braddy*, 11 F.4th at 1311. Before the stop he noticed the car's switched tag, Chandler's atypical driving, and the car's occupants appearing to argue with one another and continually turning around or looking through the mirrors to look at the officer's patrol car. During the stop he witnessed Chandler's defensive behavior, his admission to having just been released from prison, and the presence of two passengers whom Officer Seibert knew had previously been involved in criminal activity. Not only did Officer Seibert have personal knowledge that Chandler had violated multiple traffic laws but, viewing the facts in the light most favorable to the government, *see Stancil*, 4 F.4th at 1195 n.1, we conclude that the district court correctly found that the officer had reasonable suspicion to believe that the car Chandler was driving had been

24-10660                Opinion of the Court                9

stolen, *see Pruitt*, 174 F.3d at 1220.  Given the strong indications of ongoing criminal activity, it was reasonable for Officer Seibert to continue the investigation that started with a traffic stop by asking Chandler to step outside the car.  *See Arvizu*, 534 U.S. at 273 ("[R]eviewing courts should make reasonable-suspicion determinations . . . [by] look[ing] at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.") (quotation marks omitted).

   **AFFIRMED.**