MARTIN, Circuit Judge,
Concurring Specially:
I concur in the result the majority reaches in this case. I write separately, with the utmost respect for my colleagues, because I cannot concur in the reasoning the majority adopts in Part III.B of its opinion. In my view, the majority’s conclusion that Mr. Yeary’s consent to war-rantless searches as a condition of pre-trial release gave the government unfettered authority to search his home “at any time,” supra at 9, 23, is unnecessary. I would uphold the searches not under the consent doctrine (as the majority does), but instead under the traditional totality-of-the-circumstances approach to analyzing the constitutionality of warrantless searches and seizures. The majority goes beyond principles established in our precedent or that of the Supreme Court when it decides the case based on Mr. Yeary’s consent alone. I am mindful that Mr. Yeary was presumed to be innocent at the time he gave this consent. For these reasons, I cannot acquiesce in the majority’s position that consent to searches exacted from a person who has been charged but not convicted of a crime, in exchange for his liberty leading up to a criminal trial, causes him to forfeit all protections the Fourth Amendment would otherwise afford him.
Today’s majority relies on the admittedly well-settled principle that a search conducted pursuant to valid consent is constitutionally permissible. Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). Under the consent doctrine, a search that might otherwise violate the Fourth Amendment will be upheld so long as the government can establish that a person freely and voluntarily consented, waiving his rights under the Fourth Amendment. See id.
To say that the principle is well-settled is, however, quite different than saying that it has been readily extended. To date, the Supreme Court has avoided applying the consent doctrine to uphold the very sort of search presented by Mr. Yeary’s case: a search conditioned on an agreement made by a probationer or parolee as a condition of his release from jail. See United States v. Knights, 534 U.S. 112, 118, 122 S.Ct. 587, 591, 151 L.Ed.2d 497 (2001) (“We need not decide whether [the probationer’s] acceptance of the search condition constituted consent in the Schneckloth sense of a complete waiver of his Fourth Amendment rights.... ”); Samson v. California, 547 U.S. 843, 852 n. 3, 126 S.Ct. 2193, 2199 n. 3, 165 L.Ed.2d *585 250 (2006) (“[W]e need not reach the issue whether [the parolee’s] acceptance of the search condition constituted consent in the Schneckloth sense of a complete waiver of his Fourth Amendment rights.” (quotation marks and alterations omitted)).
Rather than relying on the consent doctrine, the Supreme Court has instead applied the totality-of-the-circumstances balancing test that ordinarily governs warrantless searches. Whether a search is reasonable under the totality-of-the-circumstances approach “is determined by assessing, on the one hand, the degree to which it intrudes upon an individual’s privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.” Knights, 534 U.S. at 118-19, 122 S.Ct. at 591 (quotation marks omitted). This analysis assumes — contrary to the consent doctrine upon which the majority relies — that the government’s authority to invade an individual’s privacy is still limited by its interest in doing so even when the individual consents to the invasion.
I read the majority opinion to hold that consent to searches as a condition of release from custody amounts to a forfeiture of all Fourth Amendment protections, doing away with the traditional interests-balancing analysis. I would not go this far. Instead, I would follow the Supreme Court’s tack in Knights and Samson and resolve the constitutionality of the search of Mr. Yeary’s Lake Worth residence under the traditional totality-of-the-circumstances approach.
In Knights, the defendant agreed to permit warrantless searches of his residence as a condition of his probation. 534 U.S. at 114, 122 S.Ct. at 589. Acting pursuant to the search condition, officers later searched Mr. Knights’s residence and discovered incriminating evidence. Id. at 115, 122 S.Ct. at 589. In reviewing the constitutionality of this search, the Supreme Court did not find Mr. Knights’s consent dispositive, as today’s majority would have it. Rather, his consent was a “salient” factor in assessing his reasonable expectation of privacy under the totality of the circumstances test. Id. at 118, 122 S.Ct. at 591. Because Mr. Knights had consented to government intrusions, the Supreme Court reasoned, the extent to which he could reasonably expect to be free of such intrusions was “significantly diminished.” Id. at 119-20, 122 S.Ct. at 592. And the Court balanced this diminished individual privacy interest against the government’s significant interest in regulating probationers and reintegrating them into society in light of their higher propensity to engage in criminal conduct than the general public. Id. at 120-21,122 S.Ct. at 592. This balance, the Supreme Court held, weighed in favor of permitting searches conducted pursuant to a probationer’s consent as a condition of release, at least when based on reasonable suspicion. Id. at 121, 122 S.Ct. at 592.
In Samson, the Supreme Court considered the question left open in Knights: whether a search predicated on consent to search as a condition of release from government custody would be permissible even without any individualized suspicion. Samson, 547 U.S. at 850, 126 S.Ct. at 2198. Tellingly, even though the Supreme Court framed the question as though consent to the search were dispositive, it still declined to decide the case under the Schneckloth framework. Id. at 852 & n. 3,126 S.Ct. at 2199 & n. 3. Instead, it again assumed that the Fourth Amendment balancing inquiry would limit the government’s authority to conduct the search. The interests balanced were the same as those the Court identified in Knights: the diminished individual privacy interest and the significant government interest in “reducing recidivism and *586 thereby promoting reintegration and positive citizenship among probationers and parolees.” Id. at 853, 126 S.Ct. at 2200. The Supreme Court concluded that this balance counseled in favor of permitting even suspicionless searches of post-conviction individuals who had agreed to a search condition as a term of release.[1] Id. at 853, 857, 126 S.Ct. at 2200, 2202.
Turning to Mr. Yeary’s challenge, I admit that the balance of interests is much closer than the balance before the Court in Knights and Samson. The diminished individual privacy interest is clear, for Mr. Yeary’s in-house arrest agreement “clearly expressed the search condition,” and he was “unambiguously informed” of it. Knights, 534 U.S. at 119-20, 122 S.Ct. at 591-92.
But the significance of the government’s interest in regulating people like Mr. Yeary before they are convicted is not clearly as strong as it was in Knights and Samson[2] I readily accept there may be a “propensity” among people who are released pending trial to get into trouble with the law. See S.Rep. No. 98-225, at 3 (1983) (noting the “problem of crimes committed by persons on release”); United States v. Salerno, 481 U.S. 739, 750, 107 S.Ct. 2095, 2103, 95 L.Ed.2d 697 (1987). But just how strong is that propensity compared to that of the general public, which is the relevant comparative marker the Supreme Court identified in both Knights and Samson? Cf. United States v. Mitchell, 652 F.3d 387, 413 (3d Cir.2011) (“[T]he interests in supervising convicted individuals on release and deterring recidivism do not apply to arrestees or pretrial detainees.”).
In both Knights and Samson, the government established that it had a significant interest in regulating people who had been convicted of crimes, and were serving probation or parole as a result. Specifically, the government tendered reliable statistical analyses supporting that interest. See Knights, 534 U.S. at 120, 122 S.Ct. at 592 (concluding that the recidivism rate of probationers is significantly higher than the general crime rate based on U.S. Department of Justice, Bureau of Justice Statistics studies); Samson, 547 U.S. at 853, 126 S.Ct. at 2200 (discussing several statistical studies demonstrating the significance of the state’s interest in supervising parolees in light of their higher propensity to offend). In contrast, the record in this case includes no recent data examining the *587 propensity of pre-conviction individuals to offend while on pre-trial release. I can only assume based on the studies recited in Knights and Samson that the propensity of those charged, but not yet convicted of crimes, to offend exceeds that of the general public. Although I accept the fact of a higher propensity based on these studies, I have no basis for knowing the extent of it. And the extent of the propensity determines, at least to some degree, the significance of the government’s interest. Again, there is no data in the record of this case — one way or the other — about the propensity for committing crimes of those who have not been convicted, but are awaiting trial as opposed to those who have been convicted. Based upon this dearth of information, I do not think this is a proper case for extending Samson’s rule permitting suspicionless searches predicated on consent as a condition of release for people convicted of crimes, 547 U.S. at 853, 857, 126 S.Ct. at 2200, 2202, to people who have not. And in any event, no extension of the rule is necessary to reach the result the majority did.
Given this balance of interests, I would uphold the search of Mr. Yeary’s Lake Worth residence because it was not suspi-cionless. Before conducting the search, the officers received an anonymous tip informing them that Mr. Yeary had weapons and drugs in his residence. This anonymous tip was accompanied by indicia of its reliability — Mr. Yeary’s recent arrests for drug-related offenses, of which the officers were aware. See Florida v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375, 1378, 146 L.Ed.2d 254 (2000) (noting that an anonymous tip accompanied by sufficient indicia of reliability may provide reasonable suspicion); see also United States v. Lindsey, 482 F.3d 1285, 1291 (11th Cir.2007) (finding reasonable suspicion where officers received anonymous tip that was consistent with facts already known to officers by virtue of an ongoing investigation). The particularized suspicion created by the tip and Mr. Yeary’s recent arrests, even if it does not rise to the level of reasonable suspicion, is sufficient in my view to justify the search of Mr. Yeary’s home in light of the balance of private and government interests.
I therefore concur in the result reached by the majority, but arrive at that result based upon considerations other than Mr. Yeary’s consent in his pre-trial release contract.

. It is worth bearing in mind that the Supreme Court in Samson did not sanction a search regime that subjects individuals "to capricious searches conducted at the unchecked whim of law enforcement officers.” 547 U.S. at 856, 126 S.Ct. at 2202 (quotation marks omitted). Rather, the search regime sanctioned in Samson was one that had procedural safeguards prohibiting "arbitrary, capricious or harassing searches.” Id. (quotation marks omitted). I fear that the majority today will allow precisely the sort of search “untethered by any procedural safeguards,” id. at 2202 (Stevens, J., dissenting), that the Supreme Court took pains to carve out from the exception to the warrant requirement outlined in Samson. Indeed, Mr. Yeary's consent agreement reveals no procedural safeguards. [Doc. 134:74.] Neither could I find any statutory provision outside the agreement that gives people subject to it any procedural safeguards comparable to those accompanying the regime upheld in Samson.

. Of course, it is true that Mr. Yeary was technically "post-conviction,” to the extent that he did have unrelated prior convictions at the time he consented to the search condition. But the analysis of the government’s interest focuses not on the interest in regulating someone in Mr. Yeary’s particular circumstance, but instead on the more generalized interest in regulating the class of people who are facing criminal charges yet released from custody pending trial. See Knights, 534 U.S. at 120-21, 122 S.Ct. at 592; Samson, 547 U.S. at 853-55, 126 S.Ct. at 2200-01.