[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-15476
_____

D.C. Docket No. 2:12-cr-00048-MHT-TFM-1


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MICHAEL SMITH,

Defendant - Appellant.
_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(April 29, 2016)

Before JORDAN and JULIE CARNES, Circuit Judges, and ROBREÑO,[*] District Judge.

JORDAN, Circuit Judge:

_____

[*] Honorable Eduardo Robreño, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Under *Garrity v. New Jersey*, 385 U.S. 493 (1967), "a public employee may not be coerced into surrendering his Fifth Amendment privilege by threat of being fired or subjected to other sanctions." *United States v. Vangates*, 287 F.3d 1315, 1320 (11th Cir. 2002). So, if a state threatens an employee with termination unless he provides a statement in the course of an internal investigation, it may not use that statement against the employee in any criminal proceeding or prosecution. *See id.* at 1320–21.

The main question we address today, one of first impression, is whether a state employee can, after he has been fired, waive his *Garrity* rights and allow his prior compelled and protected statements to be used by the federal government in a criminal investigation. Our answer is that *Garrity* rights may be waived in such circumstances, as long as the employee's waiver is voluntary, knowing, and intelligent. And because we conclude that Michael Smith voluntarily, knowingly, and intelligently waived his *Garrity* rights when he spoke to agents of the Federal Bureau of Investigation following his termination by the Alabama Department of Corrections, we hold that the government did not violate the Fifth Amendment when it used his prior statements in a federal criminal investigation concerning the beating and death of an inmate. We therefore affirm Mr. Smith's convictions for violating civil rights, making false statements, obstructing justice, and conspiring to obstruct justice. *See* 18 U.S.C. §§ 242, 1001, 1512(b)(3), 1512(k), & 1519.

2

**I**

We begin with the events leading to the 2010 death of Rocrast Mack, an inmate at the Ventress Correctional Facility. We set out the facts in the light most favorable to the government, *see, e.g., United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007), and then chronicle what transpired afterwards.

**A**

Mr. Smith worked as a lieutenant at Ventress, a state prison in Alabama. Though built for 650 inmates, Ventress housed over 1600 prisoners at the time of trial. The federal charges against Mr. Smith were based on his involvement in the beating and death of Mr. Mack, and his subsequent attempts to cover up his conduct.

On August 4, 2010, at around 7:30 p.m., Mr. Mack got into a physical altercation with Officer Melissa Brown after she found him masturbating in his bunk at Ventress' D Dorm. During the fight, Officer Brown and Mr. Mack hit each other with their fists. Officer Brown also struck Mr. Mack with her baton several times, and at one point, Mr. Mack took the baton away from her. Officer John Nolin tried to intervene, but by that point Mr. Mack had left his cell and gone out to the lobby of D Dorm. Nearby inmates were watching the scuffle.

Officer Brown called for help on her radio. Mr. Smith, who was the shift commander at the time, mistakenly thought that the incident was taking place

3

elsewhere, and did not immediately go to D Dorm. Several other officers, however, responded to D Dorm. Those officers surrounded Mr. Mack and began kicking and punching him. As the officers were trying to handcuff him, Mr. Mack somehow escaped. Officer Nolin thought he heard Mr. Smith say over the radio "y'all better be beating that motherfucker when I get there," and "we're going to kill that motherfucker."

When Mr. Smith finally reached Officer Brown, she had blood on her mouth and uniform, some of her fingernails were broken or missing, and her hair was in disarray. Mr. Smith told her, "don't worry about it, we're going to kill that motherfucker."

Once he got to E Dorm, Mr. Mack raised his arms over his head, dropped to his knees, and surrendered. As he did so, an officer tackled him and punched him in the head. After Mr. Mack was handcuffed, a few of the officers escorted him to Mr. Smith's office in F Dorm.

While waiting for Mr. Smith to arrive, some of the officers hit Mr. Mack—who was still handcuffed—numerous times in the chest and stomach. Before Mr. Smith returned to his office, the other officers removed Mr. Mack's handcuffs.

Upon his arrival at F Dorm, Mr. Smith grabbed a fiberglass baton from the shift office and went inside his own office. Mr. Mack was arguing with the officers who were there, but was not being physically aggressive. Mr. Smith beat

4

Mr. Mack with the baton and ultimately broke the weapon with a blow to his head. When an officer tried to pull Mr. Smith away from Mr. Mack, who had fallen to the floor, Mr. Smith said: "[D]o you see my officer down there? She got blood on her uniform, and this motherfucker gonna die." Mr. Smith then repeatedly stomped on Mr. Mack's body, neck, and head. He also pepper-sprayed Mr. Mack in the face at close range. Mr. Mack did not attempt to fight back during Mr. Smith's attack.[1]

After the beating in Mr. Smith's office, several officers handcuffed Mr. Mack and, together with a nurse, wheeled him to the Health Care Unit because he was unable to walk. They placed him on a bed so that he could be treated for his injuries. Twice Mr. Mack fell from the bed and onto the tile floor.

Mr. Smith followed the group into the HCU and ordered the nurses to leave. After the nurses were gone, Mr. Smith, with two other officers present, pulled Mr. Mack—who was still handcuffed—off the bed and, again, stomped on his head several times until he passed out. At one point, when one of the officers tried to pull him away from Mr. Mack, Mr. Smith said: "[T]rust me, I got this. . . . I'll take some days for my officers."

---

[1] Following Mr. Smith's return, other officers also hit Mr. Mack with a baton and with their fists. Three of those officers pled guilty to federal charges of deprivation of civil rights and conspiracy to obstruct justice. One of those officers testified for the government at Mr. Smith's trial.

5

Once Mr. Smith left the HCU, and the ruckus had ended, the nurses came back in and found Mr. Mack lying unconscious on the floor.  He was unresponsive and hemorrhaging from both sides of his skull.  He also had severe brain swelling, multiple facial fractures, massive bruising on his face and body, and a ruptured spleen.

Emergency personnel transported Mr. Mack to a hospital before midnight on August 4, but he died around 10:00 a.m. the next day.  The neurosurgeon who was on call at the hospital opined that Mr. Mack likely died from a culmination of all the trauma he suffered the previous evening.  The medical examiner testified that Mr. Mack died from multiple blunt force trauma and traumatic brain injury.

## B

Within hours of his attack on Mr. Mack, Mr. Smith began covering up his conduct.  He met with some of the other officers who were involved in the beatings and told them to "get [their] stories straight" and submit statements.  He instructed the officers to "document everything" and to indicate in their reports that Mr. Mack was not handcuffed and that he fought continuously from D Dorm to the HCU.

As required by the regulations of the Alabama Department of Corrections, Mr. Smith prepared a duty report and part of an incident report, but lied in those reports about the details of the beatings.  He falsely claimed, for example, that he

6

had to use pepper spray on Mr. Mack and hit him on the thigh and arms with his baton in order to stop him from fighting and allow the other officers to handcuff him. He also omitted all of the details regarding his beating (and that of others) of Mr. Mack in the HCU. To account for the head injuries Mr. Mack sustained, Mr. Smith stated that he fell off the bed several times while in the HCU.

Early in the morning of August 5, 2010, the Investigative & Intelligence Division of the ADOC (the internal affairs arm of the agency) began an administrative investigation into what had happened to Mr. Mack. Scottie Wells, an I&I investigator, interviewed Mr. Smith in the course of that investigation. At that time Mr. Mack had not passed away. During the interview, Mr. Smith told Mr. Wells the same false story that was in his duty and incident reports.

On August 20, following Mr. Mack's death, Ronald Cooper—another I&I investigator—spoke to Mr. Smith after obtaining copies of his duty and incident reports. Again Mr. Smith stuck to his untruthful version of events.

Mr. Wells did not advise Mr. Smith of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Nor did he tell Mr. Smith about his *Garrity* rights. Mr. Cooper generally discussed *Miranda* with Mr. Smith, and told him that if he invoked his *Miranda* rights, then he (Mr. Cooper) "would charge him with [his] *Garrity* rights." When Mr. Smith did not understand what that meant, Mr. Cooper told him that "*Garrity* rights are what [was] required to answer [his] questions on

7

an administrative level," and that what he (Mr. Smith) said could not be used against him in criminal court. After Mr. Smith waived his *Miranda* rights, Mr. Cooper told him that he was duty-bound to tell him everything, and Mr. Smith said he understood.

Several days after Mr. Mack's death, the Alabama Bureau of Investigation (a division of the Alabama Department of Public Safety) launched its own criminal investigation. Investigator Timothy Rodgers of the ABI spoke with a sergeant at Ventress to schedule interviews of correctional officers and other personnel at the institution. Mr. Rodgers did not specify who he wanted to speak to, and left it up to the sergeant to determine which persons had been witnesses to the incidents with Mr. Mack. Warden J.C. Giles told those who were going to be interviewed by the ABI to report to the Eufala office of the Alabama Department of Public Safety.

Over the course of several weeks, Mr. Rodgers spoke to 13 Ventress employees. Most (if not all) of those persons told Mr. Rodgers that they had been interviewed by I&I, and some (but not Mr. Smith) admitted to Mr. Rodgers that they had not been truthful with I&I. Mr. Rodgers did not review any of the statements given to I&I by Ventress personnel.

On August 9, 2010, Mr. Rodgers met with Mr. Smith. Mr. Rodgers told Mr. Smith he was conducting a criminal investigation concerning the death of Mr. Mack and advised Mr. Smith of his *Miranda* rights. Mr. Smith waived those rights

8

and agreed to speak to Mr. Rodgers. Mr. Smith repeated the same false account he had previously given to I&I (an account Mr. Rodgers was not aware of) and denied that he stomped on Mr. Mack. At no time during the interview did Mr. Rodgers ask Mr. Smith about what he had said to I&I.[2]

On September 20, 2010, Warden Giles served Mr. Smith with a notice of administrative action, charging him with violating various ADOC regulations. The notice advised Mr. Smith of a pre-dismissal conference at which he could present arguments as to why he should not be dismissed. During the conference, which was held on September 29, Mr. Smith generally denied any wrongdoing. The ADOC terminated Mr. Smith on October 1, 2010, despite his insistence that his use of force on Mr. Mack was justified.

## C

The FBI initiated a separate criminal investigation into Mr. Mack's beating and death in late August of 2010. Once I&I learned of this investigation, it ended its own inquiry and shared its files with the FBI. A few months later, the ABI also suspended its investigation and likewise forwarded its files to the FBI. The incident report that Mr. Smith partially prepared on the night of Mr. Mack's death

---

[2] The I&I and ABI interviews of Mr. Smith were taped and later transcribed. The state investigators also prepared reports of their interviews of Mr. Smith.

was included in the I&I files received by the FBI.  Mr. Smith's interviews with the I&I and ABI investigators were also in the files received by the FBI.

The federal investigation lasted more than a year.  On October 17, 2011, the FBI scheduled a meeting with Mr. Smith—who was then employed by the U.S. Postal Service—after learning that the State of Alabama intended to file criminal charges against him.  The FBI hoped that the news of a possible state indictment might give Mr. Smith some incentive to cooperate with its investigation or even confess to his involvement in the beating and death of Mr. Mack.

When Mr. Smith arrived at the FBI office, Special Agents Susan Hanson and Kelvin King advised him of the purpose of the interview.  They told him that he was not under arrest, that the interview was voluntary, that he was free to leave, and that he could refuse to answer any of their questions.  Because Mr. Smith was not in custody, they did not advise him of his *Miranda* rights.  Agent Hanson did, however, tell Mr. Smith that if he chose to answer questions it "was imperative" that he tell the truth and that, if he provided false statements, he could be prosecuted for violating 18 U.S.C. § 1001.

Mr. Smith chose to continue speaking with the FBI agents, proclaiming that he was eager to tell his side of the story.  He said that other officers had lied about the events of August 4, 2010, and he wanted to set the record straight.

10

During the interview, Mr. Smith mentioned that he had previously given statements to I&I.  The FBI agents told him that they did not have access to and had not reviewed those statements because they likely had been compelled.  Mr. Smith then began giving his account of what happened on August 4.

In the middle of the interview, but after Mr. Smith had begun to relate his version of events, the FBI agents advised him of his *Garrity* rights.  Mr. Smith said that he was familiar with and understood those rights.  The agents then presented him with a consent form that granted the FBI permission to use any and all prior statements that he might have given under compulsion.  One of the agents read the form to Mr. Smith, who said he understood its contents.  The consent form, in full, read as follows:

> I, Michael Smith, fully understand that some or all of my prior statements regarding allegations of excessive use of force against Rocrast Mack on August 4, 2010, in the Ventress Correctional Facility could be considered as having been given under administrative compulsion and therefore could not be used against me in any criminal investigation or proceeding.
>
> Nevertheless, I believe that all pertinent information should be provided to United States law enforcement officials in their investigation concerning these allegations of excessive force.  I therefore knowingly, intelligently and voluntarily waive my constitutional and statutory right not to have those statements used against me, and I voluntarily give my consent that all of my prior statements be furnished to special agents of the Federal Bureau of Investigation, the Department of Justice, and the United States Attorney's Office, knowing that these prior statements may be used against me in any criminal investigation and proceeding regardless of whether I take the witness stand in any subsequent trial.

11

Mr. Smith signed and dated the consent form, saying he had no problem with the FBI agents reviewing his prior statements because they were consistent with what he was relating to them during the interview. With that, Mr. Smith continued giving his statement to the agents. That statement was essentially the same as the one Mr. Smith had given to the ABI. When he had finished, Agent Hanson told Mr. Smith that his version was not consistent with what other witnesses had said.

## D

On March 8, 2012, a federal grand jury indicted Mr. Smith on charges related to the beating and death of Mr. Mack. The charges were two counts of deprivation of civil rights under color of law resulting in bodily injury and death, in violation of 18 U.S.C. §§ 2 & 242 (Counts 1 and 3); one count of obstruction of justice for persuading others to engage in misleading conduct, in violation of 18 U.S.C. § 1512(b)(3) (Count 5); one count of conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k) (Count 6); one count of obstruction of justice for falsifying documents, in violation of 18 U.S.C. § 1519 (Count 7); two counts of obstruction of justice for misleading conduct, in violation of 18 U.S.C. § 1512(b)(3) (Counts 11 and 12); and one count of making false statements to the FBI, in violation of 18 U.S.C. § 1001 (Count 15).

Prior to trial, Mr. Smith filed a motion to suppress, arguing that the statements he gave to the state agencies (I&I and the ABI) were compelled, and

12

had been used in the federal investigation in violation of *Garrity*. He also filed a motion for a hearing under *Kastigar v. United States*, 406 U.S. 441 (1972), asserting that the government was required to prove that all of the evidence it intended to present at trial was derived from independent sources and was not tainted by the illegal use of his compelled statements.

After holding an evidentiary hearing—at which Mr. Smith did not testify—a magistrate judge issued two reports recommending that the district court deny Mr. Smith's motions. Among other things, the magistrate judge found that some of Mr. Smith's statements (the duty and incident reports, the statements to the ABI, and the statements at the pre-termination conference) were not protected by *Garrity* because they were not compelled; that Mr. Smith was not entitled to a *Kastigar* hearing because the I&I and ABI investigations were free of any *Garrity* taint; that the federal prosecutors and FBI agents did not have access to any compelled/protected statements before Mr. Smith signed the consent form waiving his *Garrity* rights; and that Mr. Smith voluntarily, knowingly, and intelligently waived his *Garrity* rights as to his prior compelled statements during the FBI interview.

Mr. Smith raised several objections to the magistrate judge's reports. He argued, in part, that his waiver was insufficient to relinquish his *Garrity* rights because the consent form he signed did not reference *Garrity* by name or

13

specifically identify the statements that the waiver sought to cover.  He also asserted that the waiver was involuntary because he did not understand the nature of the rights he was waiving and because, prior to his execution of the consent form, I&I and the ABI had already shared his compelled statements with the FBI.

The district court overruled Mr. Smith's objections (as well as some objections lodged by the government), adopted the magistrate judge's reports, denied Mr. Smith's motion to suppress, and rejected Mr. Smith's request for a *Kastigar* hearing.  The district court assumed that the waiver of *Garrity* rights was limited to the statements Mr. Smith made to I&I and the ABI (and the derivatives of such statements).  But it ruled that the duty and incident reports, like Mr. Smith's statements at the pre-termination conference, were not compelled under threat of job loss and therefore were not protected by *Garrity*.

### E

Following a six-day trial, the jury convicted Mr. Smith of all the charges against him.  The presentence investigation report, prepared by a probation officer, recommended a base offense level of 43 under the advisory Sentencing Guidelines. The probation officer applied U.S.S.G. § 2A1.1, the guideline for first-degree murder, finding that Mr. Smith willfully, deliberately, and maliciously murdered Mr. Mack.  The probation officer also applied several guideline sentencing enhancements: committing an offense under color of law; targeting a vulnerable

14

and physically restrained victim; organizing a criminal activity with five or more participants; and obstructing justice.  As a result of the enhancements, Mr. Smith's adjusted offense level increased to 59.  Because 43 was the highest possible offense level under the Sentencing Guidelines, Mr. Smith's offense level was ultimately set at 43.  With no criminal history points, Mr. Smith had an advisory guideline range of life imprisonment.

Mr. Smith objected to the probation officer's guideline calculations.  He argued that the guideline for voluntary manslaughter, which would have resulted in a base offense level of only 29, was appropriate.  *See* U.S.S.G. § 2A1.3.  He claimed that he did not have the intent necessary to allow application of the first-degree murder guideline because he acted under an impaired capacity and substantial distress.  Mr. Smith also challenged the application of the victim-related guideline enhancements.

For the most part, the district court rejected Mr. Smith's guideline arguments.  It found that that the appropriate underlying offense was second-degree murder (not first-degree murder) and calculated a base level offense of 38.  *See* U.S.S.G. § 2A1.2.  As the district court saw things, the actions of Mr. Smith in the HCU were not consistent with voluntary manslaughter but rather demonstrated that he intended to kill Mr. Mack and had a depraved heart.  The district court further concluded that the applicable guideline enhancements raised Mr. Smith's

15

base offense level from a 38 to a 52. Again, because Mr. Smith's total offense level exceeded the maximum offense level in the Sentencing Guidelines, the district court set the total offense level at 43.

The district court denied Mr. Smith's request for a downward departure, but did vary downward from the advisory guideline range of life imprisonment. Instead of imposing a sentence of life as recommended by the Sentencing Guidelines, the district court sentenced Mr. Smith to 30 years of imprisonment on Counts 1 and 3 and 20 years on the remaining counts, with all of those terms to run concurrently. The district court also imposed three-year terms of supervised release on each count, with all of those terms to run concurrently as well.

Mr. Smith now appeals, raising a number of challenges to his convictions and sentence. We address only the issues related to Mr. Smith's *Garrity* claim, and affirm on the other issues without further discussion.

## II

In *Garrity*, 385 U.S. at 499–500, the Supreme Court held that Fifth Amendment protections apply to public employees who, under the threat of job loss, are required to make incriminating statements. Such compelled statements by public employees, ruled the Court, cannot be used in any criminal proceeding or prosecution. *See id. See also Vangates*, 287 F.3d at 1320–21. Mr. Smith requests that we vacate his convictions because the government violated his *Garrity* rights.

16

He contends that the various statements he made—the statements contained in the duty and incident reports, the statements he provided to I&I, the statements he gave to the ABI, the statements he offered at the pre-termination conference—were all given under compulsion and subsequently (and improperly) shared with the FBI during its criminal investigation.

"We review the denial of a motion to suppress as a mixed question of law and fact; 'rulings of law [are] reviewed *de novo* and findings of fact [are] reviewed for clear error, in the light most favorable to [the government,] the prevailing party in district court.'" *United States v. Spoerke*, 568 F.3d 1236, 1244 (11th Cir. 2009) (modifications in original and citations omitted).  A finding is not clearly erroneous unless we are left with a "definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). Stated differently, "[w]here there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Id.* at 574.

## A

We first address the statements in the duty and incident reports prepared by Mr. Smith.  For a number of reasons, we conclude that those reports were not compelled within the meaning of *Garrity*.

It is true, as Mr. Smith says, that the administrative regulations of the ADOC require employees to complete a report of all unusual incidents that occur during a

17

shift or tour of duty, and to cooperate with investigations by providing information and or verbal/written statements. It is also true, as Mr. Smith points out, that failure to comply with the ADOC's regulations can lead to progressive disciplinary sanctions. But where there is no direct threat, the mere possibility of future discipline is not enough to trigger *Garrity* protection:

> In the absence of a direct threat [of termination], we determine whether the officer's statements were compelled by examining h[is] belief and, more importantly, the objective circumstances surrounding it. Thus, for [an officer's] statements to be protected under *Garrity*, the officer must have in fact believed the statements to be compelled on threat of loss of job and this belief must have been objectively reasonable.

*Vangates*, 287 F.3d at 1321–22 (internal quotation marks and citations omitted). *See also United States v. Waldon*, 363 F.3d 1103, 1112 (11th Cir. 2004) ("Before a police officer's testimony will be considered 'coerced' within the meaning of *Garrity*, he must show that he subjectively believed that he would lose his job if he refused to answer questions and that his belief was objectively reasonable.").

Mr. Smith did not testify at the evidentiary hearing, and the magistrate judge and the district court found that he failed to present any evidence that he subjectively believed that he would be terminated if he refused to submit the reports. *See* D.E. 281 at 2. Indeed, the magistrate judge and the district court found that Mr. Smith's "motive to make the written statements more than likely was to deflect suspicion and avoid jail rather than [a] desire to retain his

18

employment." D.E. 187 at 7. This finding was not error, and certainly not clear error. Mr. Smith, therefore, has not satisfied the subjective belief prong of *Vangates*.

Even if Mr. Smith had put on evidence as to his own belief, "*Garrity* does not stand for the proposition that a statement made in a standard report is coerced whenever an officer faces both the remote possibility of criminal prosecution if he files the report and arguably even speculative possibility of termination if he declines to do so. Rather, the touchstone of the *Garrity* inquiry is whether the defendant's statements were coerced and therefore involuntary." *United States v. Cook*, 526 F. Supp. 2d 1, 8 (D.D.C. 2007) (holding that field and use of force reports prepared by deputy U.S. Marshal, concerning incident between himself and individual in the custody of the U.S. Marshals Service, were not coerced within the meaning of *Garrity*, in part because the deputy was not under administrative or criminal investigation when the reports were requested). *Cf. United States v. Rios Ruiz*, 579 F.2d 670, 676 (1st Cir. 1978) (not discussing *Garrity*, but holding that an arrest report prepared by a police officer could be used at his criminal trial because it "clearly does not come within the ambit of the [F]ifth [A]mendment"). So Mr. Smith fails on the second prong of *Vangates* as well. *See Waldon*, 363 F.3d at 1112 (holding that police officer did not have an objectively reasonable belief that he would be fired for refusing to testify before a grand jury even though

19

municipality's regulations reflected a "general expectation that police officers w[ould] cooperate and testify" and allowed for discipline of employees who exercised their Fifth Amendment rights). *See also* Robert Myers, *Code of Silence: Police Shootings and the Right to Remain Silent*, 26 Golden Gate U. L. Rev. 497, 525–26 (1996) ("Police officers have unsuccessfully attempted to exclude reports prepared in the normal course of their duties from criminal trials.  Arguing that preparation of the reports were mandated by departmental regulations, officers have claimed that the reports [were] 'compelled' for Fifth Amendment purposes.  This argument has been consistently rejected.") (internal footnotes and citations omitted).

## B

Next we turn to Mr. Smith's statements to the ABI.  We agree with the magistrate judge and the district court that those statements were not compelled under *Garrity*.

As an initial matter, there is no evidence that Mr. Rodgers, the ABI investigator, told Mr. Smith that he could (or would) lose his job if he failed to answer questions.  To the contrary, Mr. Rodgers informed Mr. Smith that he was conducting a criminal investigation into the death of Mr. Mack and advised him of his *Miranda* rights.  Mr. Smith waived those rights and answered the questions posed to him by Mr. Rodgers.  And although Warden Giles instructed Mr. Smith

20

(and other Ventress employees) to go to the Eufala office of the Alabama Department of Public Safety, there is no evidence that he told them they had to answer questions put to them by ABI investigators once they got there. *Cf. Benjamin v. City of Montgomery*, 785 F.2d 959, 962 (11th Cir. 1986) (holding that police officers, who had refused to testify on Fifth Amendment grounds at another officer's criminal trial, were compelled to provide testimony when city mayor threatened them with termination unless they testified).

Because there was no direct threat of termination (or similarly severe employment action), Mr. Smith had to demonstrate a subjective belief that his statements to the ABI were "compelled on threat of loss job," and that this belief was "objectively reasonable." *Vangates*, 287 F.3d at 1322 (internal quotation marks and citations omitted). As already noted, Mr. Smith did not testify at the evidentiary hearing, and he failed to present any evidence that he subjectively believed that failing to answer Mr. Rodger's questions would lead to termination. He therefore did not satisfy the subjective belief prong of *Vangates* with respect to his statements to the ABI. *See, e.g., United States v. Palmquist*, 712 F.3d 640, 645 (1st Cir. 2013) ("*Garrity* immunity is contingent upon the degree of certainty that an employee's silence alone will subject the employee to severe employment sanctions. . . . Nothing that Bond [the criminal investigator] said or presented to Palmquist [the employee] could have led Palmquist to believe that, if he remained

21

silent, he would automatically lose his job or suffer similarly severe employment consequences solely for having remained silent.").

## C

That leaves the statements made by Mr. Smith to I&I and to ADOC officials at his pre-termination conference.  We assume, without deciding, that these statements were compelled within the meaning of *Garrity*.  But we affirm the denial of the motion to suppress because Mr. Smith waived his *Garrity* protections as to those statements when he executed the consent form during the FBI interview.  *Cf. Garner v. United States*, 424 U.S. 648, 663–64 (1976) (rejecting *Garrity* claim where taxpayer, instead of asserting an available Fifth Amendment privilege, made incriminating disclosures on his tax return).

A person can waive his Fifth Amendment rights if he does so voluntarily, knowingly, and intelligently, *see Colorado v. Spring*, 479 U.S. 564, 573 (1987), and *Garrity* protections—which derive from the Fifth Amendment—are no exception to this general rule. *See United States v. Gray*, 2010 WL 1487218, at *3 (N.D. Ohio Apr. 13, 2010) (concluding that law enforcement officers waived their *Garrity* rights as to prior compelled statements by executing, during their FBI interviews, a consent form virtually identical to the one signed by Mr. Smith in this case).  A waiver is voluntary if it is the "product of a free and deliberate choice" rather than intimidation, coercion, or deception, and it is knowing and intelligent if

22

it is done with "full awareness . . . of the right being abandoned and the consequences of the decision to abandon it." *Spring*, 479 U.S. at 573. "Only if the 'totality of the circumstances surrounding the investigation' reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the [Fifth Amendment] rights have been waived." *Id.*

Whether there has been a valid waiver of Fifth Amendment rights is a mixed question of law and fact. *See United States v. Barbour*, 70 F.3d 580, 584–85 (11th Cir. 1995). Here the magistrate judge and the district court concluded that Mr. Smith's *Garrity* waiver was voluntary, knowing, and intelligent. Construing the record in the light most favorable to the government, which prevailed at the suppression hearing, *see id.* at 584, and assessing the totality of the circumstances, we agree.

First, the *Garrity* waiver was voluntary. The FBI agents asked Mr. Smith to come meet with them and he agreed to do so. At its inception, therefore, the meeting was consensual. After Mr. Smith arrived for the interview, the agents told him that they were investigating the death of Mr. Mack, that he was not under arrest, that he was free to leave, and that he could refuse to answer any questions. Mr. Smith told the agents that he wanted to tell his side of the story and set the record straight. Mr. Smith was never in custody, spoke to the agents freely, and there was no evidence of coercion, threats, or deception on the part of the agents.

23

Second, the waiver was knowing and intelligent.  When Mr. Smith said that he had previously provided statements to I&I, the agents told him that they did not have access to those statements because they likely had been compelled.  The agents advised Mr. Smith of his *Garrity* rights, and he said he understood those rights.  In the middle of the interview, the agents provided Mr. Smith with a consent form that he signed.  The first paragraph of the form informed Mr. Smith that his prior statements during the investigation into the alleged use of excessive force against Mr. Mack might have been compelled, and that, as a result, they could not be used against him in any criminal investigation or proceeding.  The second paragraph of the form stated that Mr. Smith, understanding this protection, nevertheless wanted the federal government to have all pertinent information for its investigation.

By signing the consent form, Mr. Smith voluntarily, knowingly, and intelligently agreed to make all of his prior statements available to FBI agents and federal prosecutors, even with the understanding that those statements could be used against him if he chose not to take the stand at a subsequent trial.  Although the consent form did not mention *Garrity* by name, that omission was not fatal, for the magistrate judge and the district court found that the FBI agents had explained to Mr. Smith the rights he had under *Garrity*, and Mr. Smith said that he understood those rights.  Simply put, Mr. Smith knew the rights he was giving up,

and he realized the consequences of waiving those rights.  *Cf. Chavez v. Martinez*, 538 U.S. 760, 768 n.2 (2003) (dicta in plurality opinion) ("Once an immunity waiver is signed, the signatory is unable to assert a Fifth Amendment objection to the subsequent use of his statements in a criminal case, even if his statements were in fact compelled.  A waiver of immunity is therefore a prospective waiver of the core self-incrimination right in any subsequent criminal proceeding.").

Third, and critically, there was no violation of *Garrity* by the federal government prior to Mr. Smith signing the consent form.  The magistrate judge and the district court found that "none of the prosecutors or investigators assigned to the prosecution had access to any statements [Mr.] Smith move[d] to suppress until after [he] signed the waiver form[.]"  D.E. 187 at 5.  As we explain, this finding— at least with respect to Mr. Smith's statements to I&I and at the pre-termination conference—finds substantial support in the record, and is not clearly erroneous.

FBI Agents Hanson and King testified that, although the I&I and ABI files had been received by the FBI months before Mr. Smith's interview, they had not reviewed any *Garrity*-protected materials (i.e., Mr. Smith's prior statements to I&I) prior to that interview.  Agent Hanson acknowledged that she had reviewed Mr. Smith's ABI interview and the incident report, but explained that she had not seen or been told about any of Mr. Smith's prior statements to I&I because she considered those statements compelled under *Garrity*.  Agent King, for his part,

25

testified that he was not even involved in the investigation into Mr. Mack's death until Mr. Smith's FBI interview, and had not seen any of Mr. Smith's prior statements.

The testimony of Agents King and Hanson concerning the lack of *Garrity* taint was corroborated to some degree by the state investigators. For example, Mr. Cooper testified that Agent Hanson did not want to violate Mr. Smith's *Garrity* rights and told him that she did not want to discuss or gain access to any of Mr. Smith's statements to I&I. Mr. Cooper therefore did not talk to Agent Hanson about Mr. Smith's I&I interview.

The magistrate judge and the district court credited the testimony of the FBI agents and the state investigators. Insofar as Mr. Smith's statements to I&I and to ADOC officials at the pre-termination conference are concerned, we see no basis for overturning those credibility determinations, and we agree that the FBI agents did not review or access those statements prior to their interview of Mr. Smith. *See generally Amadeo v. Zant*, 486 U.S. 214, 227 (1988); *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). We acknowledge, as indicated above, that Agent Hanson testified that she had reviewed Mr. Smith's statements to the

26

ABI prior to the FBI interview, but those statements were not, as we have explained, compelled within the meaning of *Garrity*.[3]

## III

Mr. Smith has not shown that his rights under *Garrity* were violated, and his other claims of error are not persuasive. We therefore affirm Mr. Smith's convictions and sentence.

**AFFIRMED.**

---

[3] In affirming the factual finding that any *Garrity*-protected statements made by Mr. Smith were not reviewed by the FBI agents prior to their meeting with Mr. Smith, we do not rely on the magistrate judge's subsidiary finding that, prior to the FBI interview, the federal prosecutors used a "wall" to shield the agents from any *Garrity* taint. D.E. 187 at 5. As the district court correctly noted in its order, the government did not present any evidence "as to the existence of a *Garrity*-statement filter within the [U.S. Attorney's Office] at the evidentiary hearing." D.E. 300 at 3.