[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-15785
Non-Argument Calendar

_____

D.C. Docket No. 1:13-cr-00292-RWS-CMS-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM ANGELO MARSH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(November 2, 2016)

Before WILLIAM PRYOR, JILL PRYOR and FAY, Circuit Judges.

PER CURIAM:

After a jury trial, William Marsh was convicted of one count of conspiracy

to possess with intent to distribute at least 500 grams of cocaine, in violation of 21

U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii), and 846.  He was sentenced to 86 months' imprisonment.  Marsh appeals his conviction and sentence, challenging the district court's denial of his motion to suppress a large quantity of cash found in his car, as well as the court's application of a two level sentencing enhancement for his supervisory role in the offense.  After careful review, we conclude that law enforcement had probable cause to search the car and that the district court did not err in finding that Marsh exercised influence or control over others involved in the criminal activity.  Thus, we affirm.

## I.

As part of an ongoing drug trafficking investigation, Drug Enforcement Agency ("DEA") agents received authorization to intercept telephone calls of Malachi Mutakabbir, known as Malley, and Wayne Jones, who had been purchasing cocaine from Malley.  While monitoring Malley's calls, agents intercepted a series of conversations between Malley and an individual later identified as the defendant, William Marsh.

The calls between Marsh and Malley concerned a drug transaction.  On the first recorded call, Marsh said to Malley, "I got a couple of things over that way we could probably set up that you could smash out," and "I got, uh . . . uh, some

greenery coming your way." Call Transcripts, Gov. Appx. Vol. 4 at 8-10.[1]

According to DEA Agent Terrance Woodard, in the context of the call, "greenery" referred to marijuana and "smash out" referred to cocaine.

Law enforcement learned from the intercepted phone calls that Marsh was attempting to set up a drug deal with Malley in Atlanta. Based on the intercepted calls, the DEA agents surmised that Marsh was planning to sell Malley kilograms of cocaine for $33,000 each, which Malley planned to re-sell for $34,000 each. The telephone conversations indicated that Marsh's initial plan was to have Malley pick up the drugs from one of Marsh's associates at a hotel. Malley indicated that he would prefer to pick up the package the next day.

On a call the next day, Marsh told Malley, "all you got to do is go over to my man, he at that hotel. . . . [S]natch that up." Call Transcripts, Gov. Appx. Vol. 4 at 20-27. However, Malley balked at going to the hotel, explaining that he did not want to drive a long distance and did not want to deal with people he had never met before. Marsh pleaded with Malley, explaining: "I sent him on purpose . . . specifically for you. That's it. That's the only reason why he's there. . . . I said I sent him specifically for you." Call Transcripts, Gov. Appx. Vol. 4 at 20-27. In a

---

[1] For convenience, we cite to transcripts of the intercepted phone calls. We have compared the transcripts to the audio recordings of the phone calls entered into evidence at Marsh's trial and are satisfied the transcripts accurately reflect the audio recordings.

further attempt to assuage Malley's concerns, Marsh indicated that he could send

someone Malley previously had met:

> MARSH: Look, look. OK, listen to me, though, because he's . . . he's one of my runners, dude. You know what I'm saying? And I understand what you're saying. The only other thing that I can suggest is I can send somebody to you that you know.
>
> MALLEY: Who?
>
> MARSH: Redge. Remember my man that was going to bring that green to you the last time?

Call Transcripts, Gov. Appx. Vol. 4 at 29-33. Malley, however, did not remember

Redge, and he continued to protest.

Soon thereafter, Marsh informed Malley in another call that he would bring

the package himself. Law enforcement—including Woodard, Georgia Department

of Corrections agent Lerrod Freeman, Georgia Bureau of Investigation agent Reid

Montgomery, and DeKalb County police officer Ronnie Viar—set up surveillance

at the hotel Marsh referenced on the calls. Viar was given a radio, and he

remained in communication with the other agents. At the hotel, Montgomery

witnessed Marsh emerge from a black Nissan Altima. Marsh approached a hotel

room, and the door opened without Marsh using a key or knocking. Marsh left the

room after a few minutes, now carrying a black bag. Marsh then made a series of

unanswered phone calls to Malley. While the agents attempted to follow Marsh

after he left the hotel, they lost track of the Altima.

Later that day, on a series of intercepted calls, Malley provided Marsh with directions to a condominium.  The officers made their way toward the condominium's location in an attempt to locate Marsh and his vehicle.  After a while, Woodard and Viar spotted the Altima nearby.  Viar followed the Altima, which the officers believed had already stopped at the condominium and then departed.  Viar initiated a traffic stop after he witnessed the Altima's driver commit two infractions:  windows darker than the legal limit and failure to maintain lane.  As Viar pulled the car over, he saw the driver, later identified as Marsh, move an object from the front passenger area to the back passenger area. After handcuffing Marsh and placing him in the back seat of the police car,[2] Viar proceeded to search the vehicle.[3]  He found a black canvas bag containing $33,500, consistent with the price of one kilogram of cocaine as discussed in the phone calls.

Marsh filed a motion to suppress the cash found during Viar's search, which the district court denied.  After a jury trial, Marsh was convicted of conspiracy to possess with intent to distribute at least 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii), and 846.  At sentencing, the district court

---

[2] Although Marsh does not challenge his brief detention, it does not appear that he was arrested on any charges during his encounter with Viar.  After Viar searched the Altima, he released Marsh, giving him two citations for the traffic infractions.

[3] At trial—but not at the suppression hearing—Viar testified that he walked his narcotics detection dog, Basa, around Marsh's vehicle and that Basa alerted to the center console armrest.

applied a two level enhancement for Marsh's supervisory role in the offense, pursuant to U.S.S.G. § 3B1.1(c), noting that Marsh supervised "the runner at the location, at the hotel." Sent. Trans., Doc. 261 at 20. With the enhanced offense level, and a criminal history category of I, Marsh's resulting guidelines range was 78 to 97 months' imprisonment. The district court sentenced Marsh to 86 months' imprisonment. Marsh now appeals the district court's denial of the motion to suppress and its application of the sentencing enhancement.

## II.

When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its application of the law to those facts *de novo*, construing the facts in the light most favorable to the prevailing party below—here, the government. *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011). When reviewing the application of a sentencing enhancement, "[t]he district court's determination of the defendant's role in the criminal offense is a finding of fact we review for clear error." *United States v. Hill*, 783 F.3d 842, 846 (11th Cir. 2015). "A factual finding is clearly erroneous when, although there is evidence to support it, we are left with the definite and firm conviction, after review of the entire evidence, that a mistake has been made." *Id.* A district court's choice between two permissible views of the evidence cannot be clear error. *See United States v. Smith*, 821 F.3d 1293, 1302 (11th Cir. 2016).

6

III.

A.

Marsh first contends that the district court erred in permitting the government to introduce into evidence the cash found in the back seat of his vehicle. Although the Fourth Amendment typically requires law enforcement officers to obtain a warrant prior to conducting a search, "there is what has become known as the automobile exception to the warrant requirement." *United States v. Watts*, 329 F.3d 1282, 1284 (11th Cir. 2003); *see United States v. Ross*, 456 U.S. 798, 809 (1982) (holding that, if there is probable cause to search a movable vehicle, a warrantless search does not violate the Fourth Amendment). "The automobile exception allows the police to conduct a search of a vehicle if (1) the vehicle is readily mobile; and (2) the police have probable cause for the search." *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007). "The requirement of mobility is satisfied merely if the automobile is operational." *Id*. (internal quotation marks omitted). "Probable cause, in turn, exists when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *United States v. Tamari*, 454 F.3d 1259, 1264 (11th Cir. 2006) (internal quotation marks omitted).

Marsh maintains that this case is governed not by the automobile exception, but by the search-incident-to-arrest rule fashioned in *Arizona v. Gant*, 556 U.S. 332

7

(2009). In *Gant*, the Supreme Court held that a law enforcement officer may search a vehicle incident to the driver's lawful arrest "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle" or "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Gant*, 556 U.S. at 343 (internal quotation marks omitted). But *Gant* did not upend the automobile exception. It concerned only a situation where law enforcement lacks probable cause to believe the vehicle contains evidence of criminal activity. Irrespective of the *Gant* rule, "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross* authorizes a search of any area of the vehicle in which the evidence might be found." *Gant*, 556 U.S. at 347 (internal citations omitted).

As before the district court, Marsh never grapples directly with the automobile exception. In both the district court and on appeal, the government responded to Marsh's invocation of *Gant* by disavowing any reliance on the search-incident-to-arrest exception, instead relying only on the automobile exception. And in both instances, Marsh declined to address whether the automobile exception applies.

Nonetheless, the record firmly establishes that Viar's search of Marsh's vehicle was permissible under the automobile exception to the warrant requirement. As an initial matter, Viar witnessed Marsh's vehicle in operation

immediately prior to pulling Marsh over, satisfying the mobility element of the automobile exception. *Lindsey*, 482 F.3d at 1293; *Watts*, 329 F.3d at 1285-86.

As to the probable cause requirement, a litany of evidence establishes that law enforcement had probable cause to search Marsh's vehicle. First, while monitoring Malley's telephone communications, agents learned that Malley—a known narcotics dealer—was arranging a transaction with Marsh. The use of code words like "greenery" and "smash out," as well as Malley's reluctance to drive a long distance and meet with people he did not know, indicated to law enforcement that the intercepted phone calls concerned a drug transaction.

Second, the surveillance conducted at the hotel Marsh referenced on the calls provided confirmation that Marsh intended to sell narcotics to Malley. After Marsh agreed to conduct the transaction himself, an agent witnessed Marsh emerge from his car and enter a room in the hotel where Marsh had told Malley he could pick up the goods he was purchasing. Shortly thereafter, Marsh exited the room carrying a black bag, which he put into the car. Marsh then proceeded to make a series of phone calls to Malley, though none of them was answered. Combined with the intercepted phone calls, Marsh's appearance at the hotel, retrieval of a black bag, and subsequent calls to Malley provided strong indication that Marsh was collecting the narcotics he had promised to deliver to Malley.

Third, the location of the traffic stop and Marsh's behavior after Viar stopped him was indicative of Marsh's unlawful activity.  After Marsh left the hotel, the officers lost track of him until a phone call between Marsh and Malley revealed that Marsh was heading to a condominium at Malley's direction.  Surveilling the area around the condo, law enforcement agents spotted Marsh's car.  Based on the timing of events, the officers surmised that by the time they spotted the car, Marsh had already met with Malley and left the condominium.  After lawfully stopping Marsh's vehicle, Viar witnessed Marsh moving an object from the passenger floorboard to the back seat of the vehicle.

All of this information—Marsh's communications with known narcotics dealer Malley, Marsh's brief visit to the hotel to pick up the black bag, Marsh's subsequent communications with and visit to Malley, and Marsh's behavior when he was pulled over—"would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (internal quotation marks omitted).  Although Viar, who conducted the stop and the search, may not have possessed all of this knowledge, "when a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause."  *United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir. 1990).

"Observations and other information supplied by officers involved in a common investigation can, taken together, create probable cause for a search." *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002).  Here, law enforcement agents working with Viar shared information with him, giving Viar a DEA radio through which he could hear the other officers' communications.  Thus, the officers collectively possessed the requisite knowledge to give rise to probable cause for Viar to search Marsh's car under the automobile exception to the warrant requirement.  For this reason, the district court did not err in denying Marsh's motion to suppress.[4]

## B.

Next, Marsh argues that there was insufficient evidence to support his two level sentencing enhancement for playing a supervisory role in the conspiracy.  A two level enhancement is appropriate "[i]f the defendant was an organizer, leader, manager, or supervisor" in a criminal offense.  U.S.S.G. § 3B1.1(c).  "[T]he assertion of control or influence over only one individual is enough to support a § 3B1.1(c) enhancement." *United States v. Phillips*, 287 F.3d 1053, 1058 (11th Cir. 2002) (internal quotation marks omitted); *see also* U.S.S.G. § 3B1.1(c) cmt. n.2 ("To qualify for an adjustment under this section, the defendant must have been the

---

[4] The government alternatively posits that a positive alert by Officer Viar's narcotics detection dog independently created probable cause to search Marsh's vehicle.  Because we conclude that probable cause existed without considering the dog's alert, we need not address this argument.

11

organizer, leader, manager, or supervisor of one or more other participants.").

"The government must prove the facts supporting the enhancement by a

preponderance of the evidence." *United States v. Zitron*, 810 F.3d 1253, 1261

(11th Cir. 2016).

The district court did not clearly err in finding that Marsh supervised at least

one other participant in the conspiracy.  On the intercepted phone calls between

Marsh and Malley, Marsh repeatedly referenced associates operating at his

direction.  In two of the phone calls, Marsh and Malley discussed Marsh's

associates, with Malley objecting to meeting with people he had not met

previously.  On one of the calls, Marsh told Malley he would send "one of my

runners" to deliver the drugs the two had discussed.  Call Transcripts, Gov. Appx.

Vol. 4 at 29-33.  Responding to Malley's concerns about meeting new people,

Marsh told Malley that he "can send somebody to you that you know," suggesting

somebody named Redge.  Call Transcripts, Gov. Appx. Vol. 4 at 29-33.  On the

other call, Marsh told Malley, "all you got to do is go over to my man, he at the

hotel."  Call Transcripts, Gov. Appx. Vol. 4 at 20-27.  When Marsh went to the

hotel to collect the drugs that his runner was supposed to sell Malley (after Malley

refused to go to meet the runner himself), Montgomery observed Marsh enter a

hotel room without knocking or using a key.  Montgomery testified that the hotel

12

room door "just opened for [Marsh]." Tr. Trans., Doc. 256 at 76:9-19. After a few minutes, Marsh emerged from the hotel room with a black bag.

Taken together, Marsh's references to associates operating at his direction on the intercepted phone calls and Montgomery's observations at the hotel permitted the district court to find, by a preponderance of the evidence, that Marsh asserted influence or control over at least one person in the criminal activity. Marsh's position amounts to nothing more than a disagreement with the district court's view of the evidence, which is insufficient to demonstrate clear error. *Smith*, 821 F.3d at 1302. Consequently, the district court did not err in applying a two level sentencing enhancement under U.S.S.G. § 3B1.1(c) for Marsh's supervisory role in the offense.

## IV.

For these reasons, Marsh's conviction and sentence are affirmed.

**AFFIRMED.**