[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-14124

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DARNELL DONYA RICE, JR.,

Defendant- Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:21-cr-00136-BJD-PDB-1

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and GRANT, Circuit Judges.

PER CURIAM:

Darnell Rice appeals his sentence of 60 months of imprisonment imposed after he pleaded guilty to possessing and transferring a machinegun, 18 U.S.C. §§ 922(o)(1), 924(a)(2), and making a false statement in connection with the acquisition of a firearm, id. §§ 922(a)(6), 924(a)(2). Rice argues that the district court miscalculated his advisory guideline range in determining his base offense level, United States Sentencing Guidelines Manual § 2K2.1(a)(4)(B), and applying sentencing enhancements based on findings that his offense involved at least 200 firearms, id. § 2K2.1(b)(1)(E), and that he used a firearm in connection with another felony offense, id. § 2K2(b)(6)(B). We affirm.

## I. BACKGROUND

After Rice pleaded guilty, the probation officer issued a presentence investigation report describing the offense conduct. Since as early as 2018, Rice had acted as an unlicensed firearms dealer by making straw purchases from licensed firearms dealers and selling the firearms for a profit. His two counts of conviction concerned two controlled purchases in 2021.

On November 30, 2021, an undercover officer and confidential informant met Rice at his house and asked to buy two firearms. Rice said it was late but offered to sell a Glock "switch," which could convert a Glock pistol to a machinegun. Rice explained that

he usually sold the switch for $1,500 but offered sell it for $1,000 as a holiday special. The undercover officer agreed and proposed that Rice sell him a Glock pistol the next day at a total cost of $1,800. Rice agreed and provided the switch to the undercover officer without asking whether the undercover officer was a felon or otherwise prohibited from possessing firearms.

On December 1, 2021, as planned, the undercover officer met with Rice and provided him the remaining $800 cash for the Glock pistol. An hour later, Rice purchased a Glock pistol for $542.82 in cash from US Patriot, a licensed firearms dealer in Jacksonville, Florida. At the store, he filled out an "ATF Form 4473," on which he falsely affirmed that he was "the actual transferee/buyer of the firearm(s) listed" on the form. He gave the Glock pistol to the undercover officer later that day and asked the undercover officer to show his driver's license and sign a bill of sale.

A week later, law enforcement executed a search warrant at Rice's house. On seeing a van approach his house, Rice pulled a loaded firearm from his waistband and aimed it at the van. After the agents fired at Rice and ordered him to the ground, Rice complied and tossed his firearm into the front yard. Agents found 23 firearms in the house, including a pistol with an obliterated serial number, and 3,400 rounds of ammunition. Rice agreed to speak to the agents and explained that, over the course of his life, he had purchased between 15 and 20 firearms but owned only 5 or 6 firearms. He stated that he sometimes, but not always, created a bill of sale that included a declaration that the buyer was not a felon or

prohibited from possessing firearms. He denied ever purchasing a firearm for someone other than himself. When asked about his recent purchase, he stated that he bought a Glock pistol for himself. He explained that he intended to sell a prospective buyer one of his own firearms, but when he showed the buyer a variety of available firearms, the buyer happened to choose the new Glock pistol.

The presentence report stated that Rice had been interviewed in 2019 by law enforcement about his firearms purchases. On April 23, 2019, agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives interviewed Rice, who told them that he would buy guns at stores, shows, and street sales at a good deal, hold onto them until he ran into financial trouble, and then sell them to make quick money. He stated that he started buying and selling firearms at age 18, around 2012, and estimated that he had bought and sold "hundreds" of firearms. He stated that he did not keep firearms at his house because of a recent domestic dispute with his ex-girlfriend. He also stated that he had sold a gun last week and produced about 35 bills of sale. Based on two of them, agents were able to trace a firearm that Rice bought and sold on June 12, 2017, to a crime that occurred in Maryland. Agents also traced a firearm that Rice sold to a local rap artist on June 15, 2018, to a crime that occurred in Florida.

The presentence report also stated that Rice had purchased 77 firearms from US Patriot alone, and he sometimes bought as many as 4 firearms at a time and bought many identical models, mostly with cash. Between June 2017 and March 2021, three

licensed firearms dealers in Jacksonville reported that Rice made nine multiple-firearms purchases. Law enforcement had been able to identify Rice as the original purchaser of 24 firearms that were later involved in a crime or criminal investigation. Financial analysis of Rice's banking activities revealed that, despite being 26 years old and earning a maximum of $17.50 per hour as a security guard, his net worth was approximately $219,000 and he had made about $161,084 in automatic teller machine, in-person, and online payment application deposits.

The report provided a base offense level of 20, U.S.S.G. § 2K2.1(a)(4)(B), because the offense involved a semiautomatic firearm capable of accepting a large capacity magazine and a machinegun, Rice was a "prohibited person" when he committed the offense, and he distributed the firearms with reason to believe that they would be transferred to a prohibited person. The report explained that Rice was a prohibited person because he was the subject of a temporary domestic violence injunction between March 14, 2019, and September 2019. The report did not explain whether the state court order amending the injunction on March 28, 2019, to allow Rice to possess firearms for work purposes affected his status as a prohibited person.

The presentence report applied a ten-level enhancement because the offense involved 200 or more firearms, based on Rice's statement that he had bought and sold "hundreds" of firearms since he turned 18. *Id.* § 2K2.1(b)(1)(E). But it reduced the enhancement to nine levels because the cumulative offense level from

subsections (b)(1) through (b)(4) was capped at 29. *Id.* § 2K2.1(b)(4). For this reason, the four-level enhancement that would have applied based on Rice's possession of a firearm with an obliterated serial number was reduced to zero. *Id.* The report also applied a four-level enhancement for the use of a firearm in connection with another felony offense because Rice aiming a loaded firearm at law enforcement officers in the van constituted aggravated assault. *Id.* § 2K2.1(b)(6)(B). The report applied a two-level reduction for acceptance of responsibility. *Id.* § 3E1.1(a).

Rice lodged several objections to the report. He objected to his previous firearms transactions being "relevant conduct" and denied that he was "engaged in the business of dealing firearms." He objected to the number of firearms supporting his nine-level enhancement, *id.* § 2K2.1(b)(1)(E), because those earlier transactions were not part of his instant offenses of conviction. He objected to the four-level enhancement for the use of a firearm in connection with another felony offense, *id.* § 2K2.1(b)(6)(B), because he was not charged with aggravated assault, and this incident was irrelevant to the offenses of conviction. He denied owning the firearm with an obliterated serial number, *id.* § 2K2.1(b)(4).

Rice also objected that he did not meet the criteria to support the base offense level, *id.* § 2K2.1(a)(4). He argued that the offense did not involve a firearm capable of accepting a large-capacity magazine. He argued that he was not a "prohibited person" because the temporary domestic violence injunction expired in September 2019, over two years before the instant offenses of

conviction. And he argued that there was no evidence that he knew or had reason to believe that his offense would result in the transfer of a firearm to a prohibited person, especially because he had required the undercover officer to produce his driver's license and sign a bill of sale certifying that he was a lawful gun owner who had never been convicted of a felony.

At sentencing, Rice conceded that the Glock switch qualified as a device designed to convert a semiautomatic pistol into a machinegun, 26 U.S.C. § 5845. But he argued that he was not a prohibited person, nor did he have reason to believe he was selling to a prohibited person, so his base offense level was incorrect. He also argued that he did not use a firearm in connection with another felony offense. He asserted that, when he was working on his car in his front yard, he saw an unmarked van approach with its side door open and the barrel of a rifle sticking out of the door, so he pulled out his firearm and pointed it at the van because he perceived it as a threat. He stated that, after the occupants of the van identified themselves as law enforcement, he tossed his firearm and laid on the ground. He argued that no charges were filed against him for pointing the firearm at the van.

The government responded that Rice carried a loaded firearm to protect the inventory in his house, and it did not believe that Rice was unaware that he was pointing a firearm at law enforcement because the agents were wearing marked vests and there were five cars in a row, including a marked police car. After the district court stated that it mattered whether Rice believed he

was in fear when the vehicles approached, the government invited Rice to testify on this issue, and Rice agreed.

Rice testified that he was working on a car in his front yard when he saw an "unmarked minivan with a shoe and a rifle barrel of . . . a[n] AR 15-15 hanging out of the side door." He told the person with him to get down because he thought that there was "going to be a shooting." When he saw the rifle barrel raise, he reached for the firearm in his waistband and ducked behind the vehicle he was working on. Because the van had dark windows, he did not realize there were law enforcement officers in bulletproof vests inside until the van was directly in front of his house, at which time he got on the ground and threw the firearm into the yard. The other vehicles arrived only after he was handcuffed. On cross-examination, the government challenged Rice's credibility, including his record of untruthfulness on the Bureau's forms.

The district court overruled all of Rice's objections. The district court determined that the presentence report correctly described the scope of his relevant conduct because his course of conduct was "lengthy and sufficiently imbued with evidence of gun dealing." The district court overruled his objection to the number of firearms because the record was "replete with sufficient evidence to establish the number." The district court found that Rice had committed the felony offense of aggravated assault when he aimed a firearm at law enforcement agents because it disbelieved his testimony that he acted in self-defense. And the district court agreed with the probation officer that a base offense level of 20 applied.

The district court granted the government's motion for a third-level reduction based on Rice's timely guilty plea. U.S.S.G. § 3E1.1(b).

Rice's total offense level became 30 and his advisory guideline range became 97 to 121 months of imprisonment. Based on his status as a first-time offender, age, and community ties, the district court varied downwards and sentenced him to 60 months of imprisonment.

## II. STANDARD OF REVIEW

We review the interpretation and application of the Sentencing Guidelines *de novo*, and we review underlying findings of fact for clear error. *United States v. Jackson*, 997 F.3d 1138, 1140 (11th Cir. 2021). For a factual finding to be clearly erroneous, we must be "left with a definite and firm conviction that the district court made a mistake." *United States v. Smith*, 821 F.3d 1293, 1302 (11th Cir. 2016) (quotation marks omitted). A finding of fact cannot be clearly erroneous just because the factfinder chose between two permissible views of the evidence. *Id.*

## III. DISCUSSION

We divide our discussion in three parts. First, we address Rice's base offense level. Second, we address the finding of the number of firearms involved in his offense. Third, we address the finding that he used or possessed a firearm in connection with another felony offense.

*A. The district court did not err in determining Rice's base offense level.*

Rice argues that his base offense level should have been 18 instead of 20 because, at the time of the instant offenses of conviction, he was not a prohibited person, nor did he know or have reason to believe that his offense would result in the transfer of a firearm to a prohibited person. We disagree.

Section 2K2.1(a)(4)(B) provides that a base offense level of 20 applies if the:

> (i) offense involved a (I) semiautomatic firearm that is capable of accepting a large capacity magazine; or (II) a firearm that is described in 26 U.S.C. § 5845(a); and
> (ii) defendant (I) was a prohibited person at the time the defendant committed the instant offense; (II) is convicted under 18 U.S.C. § 922(d); or (III) is convicted under 18 U.S.C. § 922(a)(6) or § 924(a)(1)(A) and committed the offense with knowledge, intent, or reason to believe that the offense would result in the transfer of a firearm or ammunition to a prohibited person.

U.S.S.G. § 2K2.1(a)(4)(B). Rice concedes that his offense involved a firearm that is described in 26 U.S.C. § 5845(a), so the only issue is whether he meets any of the three criteria listed in subsection (ii).

The district court did not err by determining that a base offense level of 20 applied because Rice was aware of at least a fair probability that he was selling a Glock and switch to a prohibited

person. Two individuals met with him at his house asking for two firearms that same day. Despite Rice's later explanation to law enforcement that he possessed a variety of firearms available for sale, Rice told the undercover officer that it was "too late in the day." After striking a deal to sell his switch that day and then sell a Glock pistol the next day, Rice bought the Glock pistol from a licensed firearms dealer for $542.82 and charged the undercover officer $800, a significant mark-up of about 50 percent over market price for which he sought no explanation. Although Rice contends that he created a bill of sale affirming that the buyer was not a prohibited person, Rice made no attempt to confirm whether the undercover officer was a prohibited person before he handed over the switch for $1,000 the day before creating the bill of sale, or before he accepted $800 from the undercover officer in order to carry out the straw purchase. And agents told Rice during the 2019 interview that several of the firearms he sold had since been recovered by police, so he was aware of the risks of being a straw purchaser. Because Rice had reason to believe his offense would result in a firearm being transferred to a prohibited person, a base offense level of 20 applied regardless of whether Rice was a prohibited person. *See* U.S.S.G. § 2K2.1(a)(4)(B).

*B. The district court did not clearly err in finding that Rice's offense involved at least 200 firearms.*

Rice argues that the district court erred in finding the number of firearms involved because it relied on his statement that he had bought and sold "hundreds" of firearms, without determining which firearms were "unlawfully" distributed. He argues that it is

not unlawful to sell a firearm without a license, and the district court erred in finding Rice was unlawfully engaged in the business of dealing firearms without a license, 18 U.S.C. § 922(a)(1). We disagree.

Rice's "relevant conduct" encompasses "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). The application note to section 2K2.1(b)(1) instructs that the number of firearms should be calculated by counting "only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed, including any firearm that a defendant obtained or attempted to obtain by making a false statement to a licensed dealer." U.S.S.G. § 2K2.1 cmt. n.5.

The district court did not clearly err in finding that Rice's relevant conduct as an unlicensed firearms dealer, culminating in the two controlled purchases in November and December 2021, involved at least 200 firearms. Despite Rice's contention that he is only an avid firearms enthusiast, the government presented evidence that his actions were more extensive than that of a hobbyist. In addition to admitting that he had bought and sold "*hundreds*" of firearms since turning 18 to make quick money, the government presented evidence that he had purchased 77 firearms from US Patriot alone, yet only 3 of those firearms were still in his possession when he was arrested. There was also uncontested evidence that he had purchased the same firearm model as many as nine times,

and he frequently purchased multiple firearms in a single transaction at three different licensed firearms dealers in Jacksonville. And the financial analysis of Rice's bank account revealed significant cash deposits of approximately $150,000 between 2018 and 2021, and that he owned his home and four vehicles outright, further supporting the finding that Rice had been engaged in the business of unlawfully selling hundreds of firearms over the course of several years predominantly to earn a profit. *See* 18 U.S.C. §§ 921(a)(21)(C), (a)(22).

### C. The district court did not clearly err in finding that Rice used or possessed a firearm in connection with another felony offense.

Rice argues that the district court erred in finding that his pointing of a loaded firearm at the van containing law enforcement officers supported the enhancement. He argues that his possession was not unlawful, nor was it part of the same course of conduct or common plan as his offenses of conviction. We disagree.

A four-level enhancement applies if the defendant "used or possessed any firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). The application notes instruct that, to determine whether this subsection applies, the threshold inquiry is whether the two offenses were "part of the same course of conduct or common scheme or plan." *Id.* § 2K2.1 cmt. n.14(E)(ii). Unless otherwise specified by the Guidelines, "other offenses must be within the relevant conduct of the charged offense." *United States v. Williams*, 431 F.3d 767, 772 (11th Cir. 2005). But the firearm need not directly facilitate the underlying

offense to be possessed "in connection with" the other offense. *United States v. Rhind*, 289 F.3d 690, 695 (11th Cir. 2002).

The district court did not clearly err in finding that Rice used or possessed the firearm in connection with another felony offense. U.S.S.G. § 2K2.1(b)(6)(B). Rice does not dispute that aggravated assault is a felony under Florida law. Because it was plausible that he was not acting in self-defense, the district court did not clearly err in disbelieving his testimony and instead finding that he committed the offense of aggravated assault. *See Smith*, 821 F.3d at 1302. Rice also does not argue that the "other felony offense" must be charged or result in a conviction to be considered relevant conduct supporting the enhancement. And at sentencing, the district court agreed with the government's argument that Rice's use of a firearm was relevant to the underlying offenses of conviction because it was part of his ongoing course of conduct in operating as an unlicensed firearms dealer out of his house, where he stored dozens of firearms and thousands of rounds of ammunition. The district court did not clearly err in finding that his use of a firearm outside of his house, one week after the controlled buys took place at that same house, was relevant conduct.

Because the district court did not err in determining Rice's base offense level or applying the enhancements, his sentence of 60 months of imprisonment is reasonable.

## IV. CONCLUSION

We **AFFIRM** Rice's convictions and sentence.